Daniel CALLAHAN, Respondent,

v.

CARDINAL GLENNON HOSPITAL,
Defendant,

and

St. Louis University, Appellant.

No. 75403.

Supreme Court of Missouri,
En Banc.

Oct. 26, 1993.

William L. Davis, Michael J. McDonnell, Robyn G. Fox, St. Louis, for appellant.

Godfrey P. Padberg, James P. Leonard, William Nolan, St. Louis, for respondent.

Morris E. Stokes, Kevin F. O'Malley, Debra J. Stachowski, St. Louis, for amicus curiae MMIC.

Mary D. Winter, Richard S. Brownlee II, Jefferson City, for amicus curiae MSMA.

Ron Simon, Washington, DC, for amicus curiae Doctors.

J. Kent Emison, Lexington, for amicus curiae MATA.

THOMAS, Judge.

Daniel Callahan ("Danny") was born on August 7, 1978. For the first three and one-half months of his life, Danny was basically healthy and normal. On November 4, 1978, Danny received Orimune, a live polio vaccine. This vaccine is an attenuated polio virus, which means it is a weakened strain of polio. Until the end of November, Danny remained basically in good health. On November 30, 1978, Danny's mother noticed a red area between Danny's anus and scrotum. The resulting events, which will be discussed below, eventually led a jury to find that Danny was a victim of medical malpractice, which caused him to be a permanent triplegic. The

jury returned a $16 million verdict in Danny's favor.

On Saturday, December 2, 1978, Danny had a fever and the red area had developed into a "boil" the size of a nickel with a white center. Danny's parents originally gave Danny some Tylenol, but when the fever persisted, they took him to Cardinal Glennon Hospital ("Cardinal Glennon"). At Cardinal Glennon, Danny's condition was initially assessed by a nurse, Ercell Williams. Williams weighed Danny and took his temperature. It was noted in the hospital records that Danny had previously received "one immunization." Danny and his mother were then directed to an examining room in the acute care unit. In the acute care unit Danny was examined by Debra Schwarz, a pediatric nurse practitioner ("PNP"). PNP's are registered nurses with additional training in pediatrics. Schwarz diagnosed the "boil" as a perirectal abscess and determined that the fever was caused by this abscess. Schwarz then left the room and subsequently returned with a list of instructions for treating Danny and a prescription for Oxycillin, an antibiotic.

The instructions provided that the abscess be soaked in warm water, that any fever be treated with Tylenol, and that Danny should see Dr. Fetick, his pediatrician, on Monday, December 4, 1978. At the time of this examination, no cultures were taken to determine whether the abscess contained gram positive or gram negative bacteria. Oxycillin is an effective antibiotic for gram positive but not gram negative bacteria. After receiving these instructions and the prescription, Danny was released from the hospital.

The hospital records indicate that Schwarz examined Danny and that Dr. John Venglarcik was the supervising physician. Danny's mother testified that she thought Schwarz was a physician and that no one except Nurse Williams and Schwarz examined Danny. Dr. Venglarcik testified that he did not recall examining Danny but admitted that his signature appeared on the chart. At this time, Dr. Venglarcik was employed as a resident by St. Louis University ("SLU"). SLU and Cardinal Glennon have an affiliation agreement where doctors employed by SLU are authorized to treat patients in Cardinal Glennon's acute care unit. Danny's parents began to administer the Oxycillin as instructed. The next day Danny remained in essentially the same condition except that he began to vomit that evening. On December 4, 1978, Danny was examined by Dr. Fetick. Dr. Fetick told Danny's mother to continue soaking the abscess in warm water and to continue giving Danny Oxycillin. On December 5, 1978, Danny's parents noticed that his legs appeared to be floppy. Danny's father called Cardinal Glennon and explained Danny's condition. Cardinal Glennon told Danny's father that babies are less active when they have a fever and that Danny did not need to be brought to the hospital.

The next morning, Danny's legs were still floppy and his eyes were rolling back into his head. That morning Danny's mother took him back to Cardinal Glennon. Doctors determined that Danny's legs and left arm were paralyzed. In the emergency room, a physician incised and drained the abscess. Cultures of the abscess revealed four types of gram negative bacteria. At this time, Danny received a different antibiotic which, unlike Oxycillin, was effective against gram negative organisms. Danny's condition did not improve and his legs and left arm remain paralyzed. After 18 days at Cardinal Glennon, Danny was released.

The Callahans filed a medical malpractice claim against SLU, Cardinal Glennon, Dr. Fetick, and American Cyanamide Co., the manufacturer of Orimune. At the time of trial, SLU and Cardinal Glennon remained as defendants.

Two expert witnesses, testifying on Danny's behalf at trial, stated that Danny's paralysis was caused by SLU and Cardinal Glennon's negligence in failing to treat the abscess properly. The theory of these two witnesses was that because the abscess contained four gram negative organisms, which release endotoxins, Danny's immune system was suppressed and susceptible to the live polio virus in the vaccine (Orimune). According to these two experts, endotoxins suppress the immune system by decreasing the number of T cells in the body. T cells are an important part of the immune system because they help identify organisms and cause

the body to produce antibodies. By decreasing the production of T cells the immune system is slowed down. Because Danny received Orimune at the beginning of November, the virus was still replicating in Danny's gastrointestinal tract when he had the abscess. The plaintiff's expert witnesses, Dr. Malone and Dr. Burmeister, testified that if the abscess had been incised and drained on December 2, 1978, as required by the standard of care, and had Danny been treated with an appropriate antibiotic, the endotoxins would not have been released and the immune system would not have been suppressed. Because Danny's system was compromised, the attenuated polio virus was able to replicate fast enough to overcome the suppressed immune system, resulting in poliomyelitis. Thus, these two expert witnesses testified that if Danny had been treated properly, he would not now be paralyzed.

On the other hand, at least some of the expert witnesses for SLU and Cardinal Glennon testified that Danny's paralysis was caused by the attenuated polio virus mutating to a virulent form after it had been ingested and had no connection to the abscess. Dr. Schwartz, one of the defense's experts, testified that in the 1980's approximately one in four hundred thousand people receiving the vaccine for the first time developed polio. At least two of the experts would not concede that Danny's paralysis was caused by polio. Some of the defense's experts asserted that the theory that endotoxins result in an immune suppression making a host more susceptible to vaccine-induced poliomyelitis was not supported by any known research or writing in the forty year history of the vaccine's use. At least one of the defense's experts conceded that if the immune system was suppressed due to the production of endotoxins the risk of contracting polio from the vaccine could occur but only if the immune system was suppressed at or near the time the vaccine was given. In addition, some of the defense experts asserted that the presence of endotoxins would actually stimulate the immune system.

After a three week trial, the jury returned a verdict against SLU and Cardinal Glennon. Danny received a judgment of $16 million in compensatory damages. After the trial, Cardinal Glennon entered into a settlement agreement with the Callahans. SLU appealed.

SLU asserts eight points of error on appeal: (1) the jury instructions were erroneous; (2) plaintiff failed to present sufficient evidence of causation; (3) the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa–10 et seq. (1988) mandates dismissal of the action; (4) the trial court mishandled questions from jurors during the trial; (5) the trial judge failed to maintain impartiality; (6) a new trial should have been granted because of misconduct by the plaintiff's attorney; (7) the trial court improperly allowed an insurance question during voir dire; and (8) the evidence did not support the $16 million judgment. We affirm the judgment of the trial court.

## I. JURY INSTRUCTIONS

Defendant SLU raises three issues with respect to jury instructions, all directed to Instruction No. 8, the verdict director submitted against SLU. That instruction reads as follows:

### INSTRUCTION NO. 8

Your verdict must be for the plaintiff, Danny Callahan, and against the defendant, St. Louis University, if you believe:

First, plaintiff Danny Callahan had an abscess on December 2, 1978, and

Second, either:

Defendant St. Louis University failed to have plaintiff Danny Callahan examined by a physician on December 2, 1978, or

Defendant St. Louis University failed to incise and drain Danny Callahan's abscess on December 2, 1978, and

Third, defendant St. Louis University in any one or more of the respects submitted in paragraph Second was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause damage to plaintiff.

The verdict director against defendant Cardinal Glennon (Instruction No. 6) was identical

except that the name of Cardinal Glennon was inserted at each place where Instruction No. 8 names defendant SLU.

■ SLU claims in its first point of error concerning jury instructions that the court erred by giving instructions that allowed the jury to return verdicts which required inconsistent, mutually exclusive findings of fact. SLU argues that the submission against defendant Cardinal Glennon (that Cardinal Glennon had failed to have plaintiff Danny Callahan examined by a physician on December 2, 1978) is supported by the evidence that Nurse Schwarz did not inform the doctor of Danny's presence or condition. On the other hand, SLU claims that the submission against it in Instruction No. 8 (that it failed to have Danny examined by a physician on December 2, 1978) required the jury to find that Dr. Venglarcik knew of Danny's presence and his condition because Nurse Schwarz informed him of those facts. Thus, SLU argues that the two verdict directors call for mutually exclusive facts, namely that Nurse Schwarz both did and did not inform Dr. Venglarcik of Danny's presence and condition. However, plaintiff contends that Dr. Venglarcik was not limited to getting this information from Nurse Schwarz because he had access to the records. Neither this objection by SLU, nor anything like it, is mentioned in the transcript of the jury instruction conference, at which objections to instructions were made, nor in SLU's motion for new trial. Therefore, nothing is preserved with respect to this objection, and we need not consider this point of error.

■ SLU's second claim of error is that Instruction No. 8 improperly submitted both the ultimate issue (failure to incise and drain) and an intermediate issue in the same chain of reasoning, namely that SLU failed to have Danny examined. SLU claims that this type of submission constitutes a "roving commission." While it is true that both submissions constitute different steps in a series of possible occurrences that resulted in the abscess not being incised and drained, plaintiff is entitled, when supported by the evidence, to select as a target for his claim of negligence any act that but for its occurrence or nonoccurrence would have resulted in injury to Danny. Under the evidence there was a dispute as to whether Dr. Venglarcik failed to examine Danny or whether he in fact examined him but did not incise and drain the abscess. Plaintiff is entitled to submit either or both in the alternative and to make his best argument.

As discussed in the plaintiff's brief, this submission is really no different than submitting in an automobile collision case that "[d]efendant knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have sounded a warning, or slackened speed and swerved, but defendant failed to do so," *see MAI* 17.04, and also submitting in the same case that "[d]efendant failed to keep a careful lookout." *See MAI* 17.05. Failure to keep a careful lookout is at least one step removed from the ultimate issue of failure to avoid the accident, but it is nevertheless an appropriate submission.

In the present case, the failure of SLU to incise and drain the abscess may have occurred because Dr. Venglarcik failed to examine Danny or because, even if he saw him, Dr. Venglarcik failed to incise and drain the abscess. We find no error in the plaintiff having submitted in the alternative that SLU failed to have Danny examined by a physician on December 2, 1978, or that SLU failed to incise and drain Danny's abscess on December 2, 1978.

■ Finally, SLU objects because the verdict director refers to an "abscess" rather than a "perirectal abscess." SLU contends that this terminology assumes a fact in dispute or avoids an otherwise controverted ultimate fact. We disagree. The ultimate issue of fact is whether failure to incise and drain the abscess constituted negligence. This issue was properly submitted in Paragraph Third of Instruction No. 8. The issue is not the label, the issue is whether the abscess, which was present, was properly treated. Plaintiff's expert testimony was that without regard to whether the abscess was called perianal or perirectal, good medical practice required that it be incised and drained. Instruction No. 8 properly submitted the issue of whether failure to incise and drain the

abscess constituted negligence. We find no merit in SLU's effort to package this issue in a label used to describe the abscess.

The instruction objections that SLU preserved are without merit.

## II. ADMISSIBILITY AND SUFFICIENCY OF THE EVIDENCE OF CAUSATION

### A. Admissibility of Expert Testimony

■ SLU's next argument is incongruous because the point of error is stated in terms of sufficiency of evidence, but most of the authority cited by SLU relates to requirements for admissibility, primarily those set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* held that for an expert witness' testimony to be admissible, the testimony must be based on scientific principles that are generally accepted in the relevant scientific community. *Id.* at 1014. This Court adopted the *Frye* rule for civil suits in *Alsbach v. Bader*, 700 S.W.2d 823 (Mo. banc 1985). Plaintiffs, however, contend that Missouri should no longer follow the *Frye* test. SLU contends that the testimony of plaintiff's experts, Dr. Burmeister and Dr. Malone, should have been excluded or given little or no weight because their testimony failed to meet the requirements set forth in *Frye*.

Both parties argue that the United States Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is substantially similar to the case before us here. However, the parties failed to recognize that the issue in *Daubert* was fundamentally different than any issue that is preserved in the present case. *Daubert* was an appeal from a pretrial summary judgment motion which assumed that, if tried, the appropriate objections would be made to the expert's testimony. The present case is an appeal from a jury verdict at trial in which there was no objection to the testimony of either of plaintiff's experts with respect to their opinions as to the diagnosis and cause of Danny's condition.

The *Frye* rule clearly deals with admissibility rather than submissibility. Admissibil-ity only becomes an issue if there is a timely and specific objection. Mo. Evidence Restated, § 103 (Mo. Bar 2d ed. 1993). In *State v. Davis*, 814 S.W.2d 593 (Mo. banc 1991), we referred to the *Frye* doctrine as a "standard for admissibility." *State v. Stout*, 478 S.W.2d 368 (Mo.1972), one of the leading criminal cases in Missouri applying the *Frye* doctrine, vividly demonstrates that the issue is properly raised as a question of admissibility. The opinion in *Stout* contains substantial excerpts from the *Frye* hearing, held outside the presence of the jury, to determine the admissibility of the results of neutron activation analysis of blood stains. In *Stout* we said, "The determining question on this appeal is whether this testimony elicited from [the expert] and presented to the jury was *legally admissible.*" *Id.* at 369 (emphasis added). Defendant SLU has cited no case, and we have found no case that permits a party to blissfully ignore the requirement to object to evidence based on the *Frye* doctrine and then "back-door" the Frye issues into the lawsuit under the guise of a sufficiency of evidence argument.

Since there was no objection to the testimony of plaintiff's experts, there is no issue of admissibility presented and none is preserved for appeal. Therefore, it would be inappropriate for us to decide in this case whether section 490.065, RSMo Supp.1992, supersedes the *Frye* doctrine in the same manner that *Daubert* held that Federal Rule 702 changes the requirements for the admissibility of expert testimony in federal court.

### B. The Causation Requirement

#### 1. "But for" Causation

■ Plaintiff contends that because this injury resulted from multiple tortfeasors and more than one cause, the substantial factor causation test should be applied rather than the "but for" test. Therefore, we need to consider whether Missouri law still includes a "but for" causation test, and if so, when? Finally, we will consider whether causation was submissible under the evidence in this case.

The "but for" causation test provides that "the defendant's conduct is a cause" of the

event if the event would not have occurred "but for" that conduct. Prosser and Keeton on Torts, § 41 at 266 (5th ed. 1984). Put simply, "but for" causation tests for causation in fact. Mere logic requires causation in fact.

There has been some confusion in the Missouri cases as to when the "but for" causation test applies. This confusion arose as a result of the recent trend among courts to describe causation as requiring that the defendant's conduct be a substantial factor in bringing about the plaintiff's harm. The substantial factor test has become popular because in the complex litigation of today, courts are often forced to deal with claims that the conduct of more than one tortfeasor caused the harm. When considering multiple causes it is misleading to talk about "the" cause, and changing the terminology to "a" cause is too insignificant an alteration to communicate to the jury the idea of contributing causes. The upshot is that lawyers and judges feel more comfortable using "substantial factor" language with multiple causes because it is consistent with and better communicates the idea of more than one cause. As this Court has moved to the use of substantial factor language, the cases have suggested that the "substantial factor" test does not include a "but for" test. *See Jackson v. Ray Kruse Const. Co.*, 708 S.W.2d 664 (Mo. banc 1986).

One reason for the confusion as to when a "but for" test is required is because the Restatement (Second) of Torts uses "substantial factor" in a different way than *Prosser*. Section 430 of the Restatement (Second) requires "legal cause" for liability. Section 431 provides that legal cause is present if the defendant's conduct is a substantial factor in bringing about the harm. Section 432 provides that the conduct is not a substantial factor unless it meets the "but for" test, which is always required except for the very narrow exception where there are two independent torts, either of which by itself would have caused the injury.

The law school example of the latter type of case is where two independent tortfeasors set fires on opposite sides of the mountain, the fires burn toward the cabin at the top, and either is sufficient to destroy the cabin.

Under these circumstances, the "but for" test fails to accurately test for causation in fact because the absence of either fire will not save the cabin. Applying the "but for" causation test to fire number one results in the conclusion that the cabin would have burned even if fire number one had not occurred because fire number two would have burned the cabin. For the same reason, applying the "but for" causation test to fire number two leads to the conclusion that the cabin would have burned even if fire number two had not occurred because fire number one would have burned the cabin. Nevertheless, it is obvious that both fires are causes in fact. This limited circumstance, hereinafter called a "two fires" case, is the only situation where the Restatement (Second) would not require a "but for" test. The confusion arises because the Restatement (Second) labels all cases where legal cause is present as substantial factor cases. Thus, under the Restatement's approach the vast majority of cases, although called substantial factor cases, are required to meet a "but for" causation test.

Prosser's approach to causation uses different terminology. He calls the overall requirement "proximate cause." Under proximate cause he would require that a "but for" test be met in all cases except in a "two fires" case, where he would replace the "but for" test with a substantial factor test. Thus, when Prosser refers to a substantial factor case, he refers to the narrow category of the "two fires" cases. In contrast, when the Restatement (Second) refers to a substantial factor case it is referring to all cases where legal causation is present, including the "two fires" cases.

The danger of frittering away a meaningful causation test lies in confusing the substantial factor category under the Restatement, which basically includes all causation, with Prosser's narrow substantial factor case ("two fires" cases only). Such confusion would eliminate the use of the "but for" causation test to the point where, as a practical matter, "causation in fact" would no longer be required.

Some lawyers and judges have come to look upon the "but for" test as a particularly

onerous and difficult test for causation. Nothing could be further from the truth. "But for" is an absolute minimum for causation because it is merely causation in fact. Any attempt to find liability absent actual causation is an attempt to connect the defendant with an injury or event that the defendant had nothing to do with. Mere logic and common sense dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought.

Two causes that combine can be tested easily by a "but for" causation test. How would such a test for causation be applied to the negligent conduct of SLU in the present case? Assume that each of the following "but for" issues is supported by the evidence. If Dr. Venglarcik was informed by Nurse Schwarz of Danny's presence and condition at the hospital but failed to see Danny, or even if Dr. Venglarcik saw Danny but failed to incise and drain the abscess, then the jury could conclude that "but for" the doctor's negligent conduct, Danny would not have contracted paralytic polio. In this instance, Dr. Venglarcik's negligent conduct would meet the "but for" causation test and would be a contributing cause to Danny's paralytic polio.

Likewise, if Dr. Venglarcik learned of Danny's condition at the hospital by reading the medical records, but he failed to see Danny, or even if he saw Danny but failed to incise and drain the abscess, then the jury could conclude that "but for" the doctor's negligent conduct, Danny would not have contracted paralytic polio. In this instance, Dr. Venglarcik's conduct would again meet the "but for" causation test and would be an independent sufficient cause of Danny's paralytic polio.

If Cardinal Glennon was still a party to this case, how would the "but for" causation test be applied to Nurse Schwarz's negligent conduct? If Nurse Schwarz failed to inform Dr. Venglarcik of Danny's presence and condition at the hospital, and the doctor had no other source of this information, then a jury could have concluded that "but for" the nurse's failure to inform the doctor, Danny would not have developed paralytic polio. As

such, her conduct meets the "but for" test and, in that respect, it is causal. This is the classic example of applying the "but for" causation test to two contributing causes.

On the other hand, if the doctor had another source of information as to Danny's presence and condition at the hospital, such as the medical records, then the doctor's negligence would have been independently sufficient to cause the injury to Danny. In this circumstance, Nurse Schwarz's conduct would not have met the "but for" causation test because, if the doctor already knew of Danny's condition, then Nurse Schwarz's failure to tell the doctor something that he already knew would not be causal absent a convincing policy argument that this situation should be treated as a "two fires" case. This is essentially the same analysis this Court has applied in failure to warn product liability cases where the injured party already had full knowledge of the information contained in the warning. *Arnold v. Ingersoll–Rand Company*, 834 S.W.2d 192 (Mo. banc 1992).

In summary, there is nothing inconsistent or different about applying a "but for" causation test to a circumstance involving multiple causes. The "but for" causation test operates only to eliminate liability of a defendant who cannot meet this test because such defendant's conduct was not causal. The fact that the conduct of a particular defendant either does or does not meet "but for" causation has no impact on the remaining defendants. The remaining defendants rise or fall on their own "but for" causation test.

Our adoption of the substantial factor test of causation in *Jackson v. Ray Kruse* has been read by some to dispense with the requirement of "but for" causation. We attempted to clarify in *Wollen v. DePaul Health Center*, 828 S.W.2d 681 (Mo. banc 1992), that the "but for" test continues to apply to the vast majority of cases in Missouri. We now reiterate that the "but for" test for causation is applicable in all cases except those involving two independent torts, either of which is sufficient in and of itself to

cause the injury, i.e., the "two fires" cases.[1] To the extent that *Jackson v. Ray Kruse* and the cases discussed therein are contrary, they are overruled.

All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the terms 1) "proximate cause," 2) "but for causation," or 3) "substantial factor" when instructing the jury. We merely instruct the jury that the defendant's conduct must "directly cause" or "directly contribute to cause" plaintiff's injury. *See MAI 19.01 [1986 Revision] Verdict Directing Modification—Multiple Causes of Damage.* The debate as to whether and when Missouri requires "but for" causation has arisen almost exclusively in the sufficiency of evidence cases such as this one. This issue can also arise, however, in the context of what is proper closing argument on a causation issue. MAI contemplates that the lawyers may explain the precise meaning of the instructions in closing arguments. *See MAI, Why and How to Instruct a Jury,* p. LXVII at XCIV.

### 2. Sufficiency of the Evidence on the Issue of "But For" Causation

We have already concluded that the expert testimony of Dr. Burmeister and Dr. Malone concerning the causal connection between SLU's negligence and Danny's injury was properly admitted. Inadmissible evidence received without objection may properly be considered in determining the sufficiency of the evidence. *Appelhans v. Goldman,* 349 S.W.2d 204, 207 (Mo.1961). SLU is, therefore, reduced to arguing that the testimony of plaintiff's experts is so deficient in weight and credibility that it has little or no value on the issue of causation.

In *Appelhans,* 349 S.W.2d 204, plaintiffs brought an action for injuries suffered as the result of a car accident. At trial, plaintiffs admitted a stopping distance chart along with the testimony of their expert witness thereon. On appeal, defendant asserted the admission of the exhibit and the testimony by plaintiffs' expert witness was prejudicial error because it was hearsay. Defendant, however, failed to make a proper and timely objection to the admission of such evidence. Defendant merely objected on the general grounds that the exhibit and testimony were irrelevant and that the chart was not properly identified. After several questions and explanatory answers regarding the chart and the witness' answer that he was stating what the chart presented and not his personal knowledge, counsel finally did make an untimely hearsay objection. This Court, however, held that since defendant failed to properly object to the admission of the evidence, plaintiffs' exhibit and the expert's testimony thereon could be considered in determining the sufficiency of the evidence even if it was hearsay. This Court also noted in *Appelhans* that, in determining the sufficiency of the evidence, "plaintiff is entitled to the benefit of all favorable probative evidence and all favorable inferences to be drawn therefrom, and defendant's evidence is to be disregarded unless it aids plaintiff's case...." *Id.* at 208 (citing *Price v. Nicholson,* 340 S.W.2d 1 (Mo. banc 1960). We will, therefore, review the testimony of Dr. Malone and Dr. Burmeister in the light most favorable to the plaintiff.

Both experts for Danny were able to assert a reliable scientific basis for their theory that the improper treatment of the bacterial infection led to Danny developing poliomyelitis. SLU asserts, however, that Dr. Burmeister and Dr. Malone did not base their testimony on any epidemiological studies indicating that the polio vaccine will develop

---

1. We need not determine whether two independently sufficient acts of omission (as opposed to affirmative conduct as to where the tort-feasor has set the two fires) should be treated as a "two fires" case. For example, if Defendant 1 ("D1") furnishes a rental car that has no brakes and Defendant 2 ("D2") gets into a situation where he negligently fails to depress the brake pedal, each may argue that he can avoid liability under a "but for" causation test; i.e. D1, who furnishes the car, argues that the accident would have

occurred even if the brakes were proper because D2 did not apply the brakes, and D2 argues his failure to apply the brakes did not cause the accident because the brakes would not have worked anyway. The court might say both are liable because this is a "two fires" case. On the other hand, it has been argued that this is not like the classic "two fires" case. See David A. Fischer, Causation in Fact in Omission Cases, 1992 Utah L.Rev. 1335, 1361-64, 1380-84 (1992).

into the polio virus if a child's immune system becomes suppressed. The doctors did not base their testimony on epidemiological studies because, in the forty year history of the use of the polio vaccine, the occurrence of vaccine-induced poliomyelitis has been extremely rare and there are no definitive studies indicating that a bacterial infection will or will not cause a person's immune system to be suppressed. It is not uncommon for areas of medicine involving rare diseases or causes to receive limited funding for research and studies.

Although the absence of epidemiological studies weakens the probative value of Dr. Burmeister and Dr. Malone's conclusions, it is not dispositive of the issue. Both doctors were able to extrapolate from what occurs in other areas of the medical field when a human being's immune system is suppressed to what is likely to occur when a person's immune system is suppressed and comes in contact with the attenuated polio virus in the vaccine. Furthermore, each logical step leading to the opinions of Dr. Burmeister and Dr. Malone was based on reliable "scientific knowledge." It is also worth noting that both of plaintiff's experts had a history of testifying primarily for defendants.

Dr. Burmeister is board certified in internal medicine and is board eligible in infectious disease. He was an assistant professor of microbiology at SLU. While he was in the military he did research in the field of biological warfare. He was president of the medical staff at SLU and has been the chairman of various committees dealing with control of infectious disease and antibiotic performance at various hospitals. Although he is not a pediatrician, he does treat children in the course of his practice. In forming his opinions, Dr. Burmeister relied on his own experience concerning the interaction between viral infections and bacterial infections. He relied on published studies in other areas of medicine indicating that endotoxins in human beings can cause a person's immune system to be suppressed and cause a person to be more susceptible to disease. Furthermore, he relied on the package inserts and *Physician's Desk Reference* information that accompanies the polio vaccine, which caution

against the use of the vaccine in a patient who is suffering from an acute illness; in a patient with genetic immune deficiencies; and in a patient whose immune system was suppressed due to other factors, including steroids, immune serum globulin therapy, radiation, chemotherapy, and leukemia. In combination, this information provides reliable support for each step of reasoning Dr. Burmeister used to conclude that if endotoxins have suppressed a person's immune system, the attenuated polio virus in the vaccine may overwhelm a person's immune system and develop into the polio disease.

Dr. Malone is a medical doctor licensed to practice in South Carolina. He is on the faculty and staff of the medical school at the University of South Carolina and on the staff of the veteran's hospital in Charleston, South Carolina. He is a member of the Academy of Neurology, the American Society of Neurochemistry, the International Society of Neurochemistry, and the International Society of Pediatric Neurology. He has also had experience in treating children with acute poliomyelitis. Dr. Malone's testimony, based on various immunology studies that reported an immunosuppressive effect following the administration of endotoxins to healthy adults, reached the same conclusion as Dr. Burmeister.

SLU asserts that "but for" cause was not established here because Danny is an individual who was susceptible to the polio disease and would have developed the disease from the vaccine regardless of SLU and Cardinal Glennon's failure to treat the abscess properly. SLU, therefore, contends that Danny's paralysis would have occurred regardless of whether SLU or Cardinal Glennon acted or did not act. However, both Dr. Malone and Dr. Burmeister testified without objection that if the abscess had been treated properly, Danny's immune system would not have been suppressed, the vaccine would have developed antibodies to the polio virus, and, as a result, Danny would not be paralyzed.

In testing the sufficiency of the evidence, we must take Dr. Malone and Dr. Burmeister's testimony in the light most favorable to the plaintiff. Therefore, causation was a question for the jury, and the jury believed

that Danny would not have developed polio "but for" the actions of SLU and Cardinal Glennon. This point is denied.

### 3. Natural and Probable Consequence—Foreseeability

■ Defendant SLU contends that Danny's paralytic polio was not the natural and probable consequence of the failure to incise and drain the abscess because there is no previous case reported in which failure to incise and drain resulted in paralytic polio. In other words, defendant SLU argues that this result is not foreseeable and is, therefore, not causal. Many jurisdictions do incorporate some form of a foreseeability requirement into proximate cause.

Proximate cause requires something in addition to a "but for" causation test because the "but for" causation test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage. For example, carried to the ridiculous, "but for" the mother and father of the defendant conceiving the defendant and bringing him into this world, the accident would not have happened. However, obviously, this is not a basis for holding the mother and father liable. A few jurisdictions limit "but for" causation with a pure foreseeability test. Most of these jurisdictions find the origin of their authority in the famous case of *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928).[2]

■ Missouri, like many other states,[3] has not applied a pure foreseeability test; we have generally said that the injury must be a reasonable and probable consequence of the act or omission of the defendant. *Foley v. Hudson,* 432 S.W.2d 205, 207 (Mo.1968); *Floyd v. St. Louis Public Service Co.,* 280 S.W.2d 74, 78 (Mo.1955). This is generally a "look back" test but, to the extent it requires that the injury be "natural and probable," it

probably includes a sprinkling of foreseeability. To the extent the damages are surprising, unexpected, or freakish, they may not be the natural and probable consequences of a defendant's actions. If the facts involved an extended scenario involving multiple persons and events with potential intervening causes, then the requirement that the damages that result be the natural and probable consequence of defendant's conduct comes into play and may cut off liability. This type of fact situation is not present in this case; there were no other parties or potential intervening causes present. It was clear that any negligent treatment by the doctor or nurse would result in injury to the patient, Danny.

■ SLU contends that the injuries are not foreseeable and, therefore, are not causal as a matter of law if a particular injury sustained by Danny is not foreseeable. However, no such requirement exists. It is sufficient for liability if a reasonable defendant could foresee the person who would be injured as opposed to the nature of the injury. As this Court has previously stated:

> It is of course unnecessary that the party charged should have anticipated the very injury complained of or anticipated that it would have happened in the exact manner that it did. All that is necessary is that he knew or ought to have known that there was an appreciable chance some injury would result.

*Tharp v. Monsees,* 327 S.W.2d 889, 894 (Mo. banc 1959). Here, it was clear to everyone that if Danny received negligent medical care some injury would likely result to him. This meets traditional causation requirements and requires us to reject SLU's argument that the doctor or nurse needed to foresee that paralytic polio might reasonably be caused by the failure to incise and drain.

As *Prosser* states: "It is as if a magic circle were drawn about the person, and one who breaks it, even by so much as a cut on the finger, becomes liable for all resulting

---

**2.** We recognize, but refuse to become immersed in, the debate that has raged on since Palsgraf as to whether Palsgraf is a no duty case as opposed to a no causation case or some mixture of both. To the extent that Missouri cases reflect this no

duty analysis we do not intend to reject that analysis by what we say herein.

**3.** See Prosser, § 43 at 282.

harm to the person, although it may be death." *Id.* § 43 at 291. For example, most states have a line of cases commonly referred to as "thin skull" cases. In *Heppner v. Atchison, Topeka and Santa Fe Ry. Co.*, 297 S.W.2d 497 (Mo.1956), a railroad employee suffered a blow to his back when the train in which he was traveling lurched; this blow activated a dormant cancer in his adrenal gland which caused the cancer to spread throughout his body. Shortly after this incident, the railroad employee died from cancer. This Court in *Heppner* held that the jury could find that the railroad's negligence activated a latent disease and that the railroad was liable for all of the resulting harm that flowed from its negligence. *Id.* at 504.

Just as in *Heppner*, where we did not require that the defendant foresee that its negligence would activate a latent disease in the plaintiff, we will not require Nurse Schwarz and Dr. Venglarcik to foresee that the failure to incise and drain would cause Danny's paralytic polio. Any time a physician or nurse acts negligently in the treatment of a patient, it is foreseeable that this may result in injury to the patient. Defendant SLU's contention that this Court must enter a judgment for SLU as a matter of law because no reasonable doctor or nurse could foresee that Danny would contract paralytic polio by reason of the failure to incise and drain Danny's abscess is without merit. The trial court was correct in determining that the requirement of foreseeability, to the extent that it exists under Missouri law, was met and the issue of causation was submissible to the jury.

### III. NATIONAL CHILDHOOD VACCINE INJURY ACT

 Next, SLU incorrectly asserts that the trial court erred in failing to dismiss Danny's petition pursuant to the National Childhood Vaccine Injury Act. 42 U.S.C. § 300aa–10 et seq. (1988). The pertinent section of the statute provides: "No person may bring a civil action for damages ... against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine related injury or death associated with the administration of a vac-

cine ..." 42 U.S.C. § 300aa–11(a)(2)(A). We agree with SLU that the purpose of this statute is to ensure the continuance of vaccine production by manufacturers who fear liability. SLU, however, has no basis to raise the argument that this statute warrants the dismissal of this case. They were not the manufacturer, administrator, or in any way related to Danny Callahan's polio vaccine.

 SLU also contends that the trial court erred in not permitting counsel to inquire during voir dire whether any jurors had knowledge of this Act. This Court recognizes "the broad discretion vested in the trial court for determining the propriety of questions during the voir dire." *State v. Holland,* 653 S.W.2d 670, 678 (Mo. banc 1983). Unless there is an abuse of that discretion, we will not interfere. We might even go so far as to say that this discretion will not be disturbed absent "manifest abuse." *See McMillin v. Union Electric Co.,* 820 S.W.2d 352, 354 (Mo.App.1991). SLU is displeased with the trial court's finding that the questions were irrelevant, but fails to assert why the questions are relevant. SLU also fails to show how the trial court abused its discretion or caused harm by not allowing the questions. Because the Act does not preclude liability for SLU and there was no showing of abuse of discretion by the trial court during voir dire, this argument fails.

### IV. JUROR QUESTIONS

SLU asserts that the trial judge improperly allowed jurors to ask questions. After a juror inquired whether jurors are permitted to ask questions, the trial judge indicated written questions could be submitted to him. The trial judge's original procedure when he received a question from a juror was to read the question to all of the attorneys. After this occurred, Cardinal Glennon made a motion that jurors' questions not be shared with the attorneys. The motion was sustained, but the jurors were permitted to continue submitting questions to the judge.

After sustaining the motion, the judge received the following cryptic note from one of the jurors: "Meningitis Jury 556 Health History D.J. [plaintiff's initials] Mother Do The Family Have A Pet." Because the judge

thought this note meant that the juror's mother was ill, he allowed the attorneys to read it.[4] Danny's attorney, acting upon this note, recalled Danny's mother and asked her whether any family members had ever had meningitis or if the family ever owned a pet with a neurological disorder. She responded in the negative to both questions. SLU and Cardinal Glennon objected and moved for a mistrial claiming that the judge had contradicted his previous holding that he would not read juror questions to the attorneys. The trial judge overruled this motion on the grounds that the attorneys voluntarily read the note.

On appeal, SLU contends that the trial court abused its discretion by permitting jurors to ask questions during the trial. A trial court, however, has the discretion to permit or deny jurors the privilege of asking questions. *Sparks v. Daniels,* 343 S.W.2d 661, 667 (Mo.App.1961) (judge should filter questions from jurors through the bench to ensure that no improper questions are asked of a witness). Therefore, the trial judge did not abuse his discretion in permitting the jurors to ask questions.

SLU also asserts that even if it is proper to allow jurors to ask questions, the trial judge abused his discretion by actively encouraging the jurors to ask questions. We do not reach the question of whether a trial judge by actively encouraging jurors to ask questions commits an abuse of discretion. In this case, the trial judge did not encourage the jurors to ask questions. He only indicated that he would allow the jurors to ask questions during the trial.

SLU further asserts that the trial judge abused his discretion by overruling the motion for a mistrial. SLU contends that the trial judge should not have shared the cryptic note with the attorneys after sustaining Cardinal Glennon's previous motion. SLU argues that having access to the thought processes of jurors gave Danny's attorney an advantage. SLU asserts that this advantage was demonstrated by the subsequent questioning of Danny's mother about

meningitis and about family pets. The trial judge is in the best position to determine whether a juror's question prejudiced a litigant. *Hornsby v. West,* 665 S.W.2d 372, 373 (Mo.App.1984). Furthermore, a trial judge should view the question in the context of the entire trial. *Id.* Here, even if the judge erred in sharing the confusing question with the attorneys after sustaining Cardinal Glennon's motion, the trial lasted three weeks, during which time twenty-six witnesses testified, either live or by deposition and, as a result, the impact of this questioning was minimal at best. Danny's attorney, in opposing the mistrial motion, indicated that he intended to pursue Danny's family's health history. SLU failed to show that it was prejudiced by the admission of this testimony. Under the circumstances, we do not find that the trial court abused its discretion in denying the motion for a mistrial. Therefore, this point is denied.

## V. IMPARTIALITY OF THE TRIAL COURT

Next, SLU asserts that the trial court erred in failing to declare a mistrial because the trial judge failed to maintain his role of impartiality. A mistrial is a drastic remedy, and the decision to grant one is largely within the discretion of the trial court. *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 208 (Mo. banc 1991). We will reverse only where there has been a manifest abuse of discretion. *Pierce v. Platte–Clay Elec. Coop,* 769 S.W.2d 769, 778 (Mo. banc 1989). But to establish a manifest abuse, there must be a grievous error where prejudice cannot otherwise be removed. *Seabaugh,* 816 S.W.2d at 208.

A trial judge must maintain an impartial attitude in conduct and demeanor. *Duncan v. Pinkston,* 340 S.W.2d 753, 757 (Mo.1960). A judge exerts great influence over the jury, and such influence often manifests itself inadvertently. As such, it is "improper for the judge, by act or conduct, gesture or demeanor, by remarks or comments to indicate any opinion on ... the credibility of a witness." *Id.*

---

4. The judge later discussed the note with the juror who submitted it and learned that the juror

intended to convey a question that he wanted the attorneys to ask.

We defer to the trial judge's description of the events in the courtroom. While the jury was taking a short break in the jury box, a brief conversation took place between the judge and Dr. Burmeister, one of plaintiff's expert witnesses who was on the stand. The discussion concerned the judge's recent bout with the flu. Following the conversation the judge and the doctor smiled at each other. SLU contends that this exchange lent itself to establish the credibility of the witness in the judge's eyes, which in turn influenced the jury. According to the trial judge, however, the entire incident occurred out of the hearing of the jury and, contrary to SLU's contention, no laughing, joking or other demonstrative behavior took place. From the events described in the record, we do not find that the judge failed to remain impartial. Accordingly, we find no manifest abuse of the trial court's discretion and affirm the denial of the motion for a mistrial.

## VI. MISCONDUCT BY THE PLAINTIFF'S ATTORNEY

SLU asserts eleven instances of misconduct by plaintiff's counsel. We will address each assertion briefly bearing in mind:

> in cases of misconduct, improper argument, prejudicial evidence or other improper incidents in the course of a trial, the necessity of the drastic remedy of a mistrial is a matter resting in the sound discretion of the trial court and that, absent a manifest abuse of that discretion, [we] should not interfere.

*Hoene v. Associated Dry Goods Corp.*, 487 S.W.2d 479, 485 (Mo.1972).

First, SLU argues that counsel failed to produce a report from an expert witness after they had established sufficient grounds for production. Defendants requested reports prepared by plaintiff's experts, and their request was denied as work product. When they again requested the reports, Danny's counsel stated his belief

that no such reports existed. On the first day of trial, Danny's attorney submitted a letter from Dr. Malone to the judge for in camera inspection. While the judge found this to be a "report" as requested, he once again denied the defendant access to it because of the work product doctrine. During cross-examination Dr. Malone admitted that he had used the letter to refresh his memory before he testified. SLU was then given the document after it was again requested. *See United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).[5] SLU did not object to the trial court's resolution of the situation, had ample time to review the letter after it was provided, and extensively cross-examined Dr. Malone. As such, no error or prejudice resulted.

Next, SLU alleges that Danny's counsel failed to inform them that Dr. Malone would materially alter his causation opinion. According to the record and the ruling of the trial judge, the change in opinion was from a reasonable medical probability to a reasonable medical certainty. This does not constitute a material alteration that would require notification to opposing counsel.

Third, SLU contends that after use of an enlarged exhibit was ruled improper, Danny's counsel failed to remove it from the jury's sight. When SLU objected to this behavior in chambers the day after the incident occurred and moved for mistrial, the judge stated that he did not believe counsel's actions were intentional or that any jurors read or would be able to understand the exhibit. We defer to the trial judge's observation of the situation and find no prejudicial effect.

Fourth, SLU contends that during cross-examination, Danny's counsel attacked Dr. Cherry, an expert witness for the defense, on a collateral issue involving research grants he had received from Lederle Laboratories, Inc., the manufacturer of Orimune and other vaccines. It is well estab-

---

5. The Court held that where a party makes testimonial use of work product material, the work product doctrine is waived with respect to matters covered in the testimony. In *Halford v. Yandell*, 558 S.W.2d 400 (Mo.App.1977), the Missouri court held that work product ceases to exist at the start of the trial. Work product is solely a defense to discovery. At trial, information previously protected by the work product doctrine becomes admissible if it is relevant.

lished that the extent and scope of cross-examination in a civil action is within the discretion of the trial court and "will not be disturbed unless an abuse of discretion is clearly shown." *Stafford v. Lyon,* 413 S.W.2d 495, 498 (Mo.1967). This is especially true for cross-examinations of expert witnesses. There is wide latitude "to test qualifications, credibility, skill or knowledge, and value and accuracy of opinion." *Id.* Further, the pecuniary interest, bias or prejudice of a witness is not collateral and can always be shown subject to the limitations "imposed by the trial judge in his sound discretion." *Houfburg v. Kansas City Stock Yards Co. of Maine,* 283 S.W.2d 539, 548–49 (Mo.1955). Basically, the jury is entitled to know information that might affect the credibility of the witness, the weight to give his testimony, and any relation he may have with parties interested in the outcome of the case. *Schuler v. St. Louis Can Co.,* 18 S.W.2d 42, 46 (Mo. 1929). While this rule has most often been applied to cases where the expert witness is a doctor employed by the defendant's insurer to examine the plaintiff, the underlying logic is applicable in the instant case. Here, Dr. Cherry's testimony was based on his editorial in the *Journal of the American Medical Association.* The editorial reflected very favorably on Lederle. From his testimony it was revealed that financial assistance for Dr. Cherry's department and research came through large grants from Lederle. It was also revealed that Dr. Cherry testified for Lederle and other similar companies against plaintiffs in eighty to one hundred products liability or medical malpractice actions. Even though Lederle is no longer a party to this action, this evidence was admissible to show possible prejudice or bias. How far this inquiry may go into the details of the interest or prejudice is left for the trial court to decide. *State v. Pigques,* 310 S.W.2d 942, 947 (Mo.1958). Therefore, the trial court did not err in allowing this line of questioning because the jury has the responsibility to determine the credibility and weight it should give to an expert's testimony. *See also Weatherly v. Miskle,* 655 S.W.2d 842 (Mo.App.1983).

▆▆▆ Fifth, SLU contends that Danny's counsel improperly injected another pending lawsuit into evidence. During cross-examination of Dr. Anderson, Danny's counsel asked, "Have you at any time been told by the defendants for either St. Louis University or Cardinal Glennon that a boy by the name of Ryan Kress developed polio after he had...." Counsel for Cardinal Glennon interrupted the question at that point, and the attorneys were immediately called to side bar. Dr. Anderson was also asked to join the discussion at the bench. The rest of the proceedings surrounding the incident were out of the hearing of the jury. At side bar it was established that Dr. Anderson had no knowledge of the case mentioned where a child developed polio after having a bacterial infection. The trial judge ruled that counsel had not gotten far enough into the question to give the impression that the defendants were trying to hide evidence from the jury. SLU contends that during the side bar Danny's counsel gestured and picked up a file to give the impression that defendants were trying to hide something. No mention of this is made in the record by either defendant. In fact nothing in the record substantiates SLU's claims. Accordingly, we can find no error or prejudice.

Sixth, SLU asserts improper conduct during cross-examination of witnesses. Once again, whether a mistrial should be granted from improper cross-examination of a witness is a matter within the sound discretion of the trial court and absent manifest abuse of discretion we should not interfere. *Hoene,* 487 S.W.2d at 485. SLU cites several instances in the record where allegedly improper arguments occurred. These instances were either cured by the judge after objection or had no prejudicial effect. These situations do not merit a finding of manifest abuse of discretion.

▆▆▆ Seventh, SLU asserts that counsel utilized a list of Danny's wishes in direct examination to prompt Danny to cry and evoke sympathy from the jury. As a rule, emotional demonstrations, such as crying, by those who are parties or who are observing a personal injury action should be avoided. *Garrison v. Ryno,* 328 S.W.2d 557, 568 (Mo. 1959); *see Eichelberger v. Barnes Hosp.,* 655

S.W.2d 699, 707 (Mo.App.1983). However, whether such emotional displays engender passion and prejudice sufficient to invoke sympathy on the part of the jury is something we think should be left largely to the discretion of the trial court. *Walton v. U.S. Steel Corp.*, 362 S.W.2d 617, 627 (Mo.1962). Again, the trial court is in the best position to observe the incident, the general atmosphere of the courtroom, and the impact on the jury. We defer to the judgment of the trial court and have no basis for finding an abuse of discretion.

■ SLU's final four points allege improper closing argument from Danny's counsel. In evaluating these assertions we remember that "[d]etermining the prejudicial effect of final argument is a matter within the discretion of the trial court, and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion." *Hoover's Dairy v. Mid–America Dairymen*, 700 S.W.2d 426, 434 (Mo. banc 1985). Wide discretion is given to a trial judge and, absent abuse, the judge's decision will stand. *Norfolk & Western Ry. Co. v. Greening*, 458 S.W.2d 268, 273 (Mo.1970).

■ SLU first complains that Danny's counsel asked the jury to consider potential retribution being faced by one of their expert witnesses, Dr. Burmeister, as a result of his participation in the lawsuit. SLU objected when this argument was made, the objection was sustained, and the court, on its own, instructed the jury to disregard the remark. The incident was cured by the trial judge, therefore, we must assume the jury followed the judge's instruction and disregarded the statement. In accordance with our assumption, we find no prejudicial effect.

■ SLU next complains that Danny's counsel mischaracterized the testimony of one of the defense witnesses, Dr. Barry. During closing argument, counsel stated that Dr. Barry indicated that Danny's abscess should have been incised and drained. Dr. Barry, in his deposition, indicated in various places that, when following correct procedure, both perianal and perirectal abscesses should be incised and drained. In closing argument "counsel is traditionally given wide latitude to suggest inferences from the evidence." *Moore v. Missouri Pacific R. Co.*, 825 S.W.2d 839, 844 (Mo. banc 1992). This rule applies even though the inferences may seem illogical or even erroneous. *Id.* The judge overruled an objection by SLU, then to cure any possible error instructed the jury to recall the evidence as they had heard it. The trial court's "broad discretion in ruling on the propriety of closing argument" was appropriately applied in this case. *Id.* SLU's assertion has no merit.

■ SLU complains that Danny's counsel argued an adverse inference based on two St. Louis University doctors not being called to appear at trial, but whose reports were introduced into evidence. It is true that

[t]he failure of a party to call a witness having knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to proffer it. . . . It is improper, however, for a party to argue the negative inference resulting from his opponent's failure to produce such a witness if the witness is equally available to both parties.

*Leehy v. Supreme Exp. & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983). Dr. Cantor was deposed by Danny's counsel and Dr. O'Reilly, as a treating physician, could have been deposed. However, we are not convinced that the statements referred to as the basis for this argument were an attempt by counsel to raise an adverse or negative inference. We find that the comments made were not prejudicial in nature. SLU argues that a misquote by the court reporter, if corrected, would substantiate this claim. We have no basis to believe that the reporter was mistaken nor will we alter the record to favor SLU.

■ Finally, SLU claims that counsel improperly referred to letters written by Dr. O'Reilly and Dr. Cantor during closing argument. Dr. O'Reilly's letter was admitted into evidence and portions of it were read to the jury during Dr. Malone's testimony. It provided in part: "I feel that he [plaintiff] has a quadr[i]paresis apparently secondary to infection." During closing argument, Danny's counsel merely restated a portion of the letter. There was no misconduct.

Dr. Cantor's letter addressed to Danny pediatrician, Dr. Fetick, provided in part: "Thank you very much for allowing me to follow this fascinating child with his triplegia that seems related to his perianal abscess...." Although Danny's counsel did not misstate the contents of the letter, it is rather misleading. But because the letter was in evidence, the reading of a portion of this letter was not sufficient to establish misconduct by Danny's attorney.

 SLU has taken great pains to cite instances of possible attorney misconduct in this case. We are, of course, aware that attorneys use legal tactics to facilitate a favorable outcome for their clients, but none of the incidents cited by SLU resulted in error or were prejudicial in effect. Where various incidents referred to do not constitute error, an accumulation of non-erroneous incidents cannot result in error. *Gathright v. Pendegraft*, 433 S.W.2d 299, 317 (Mo.1968). As such, we find no abuse of discretion by the trial judge in evaluating the conduct of the attorneys. The trial judge correctly denied SLU's motion for a mistrial.

## VII. INSURANCE QUESTION DURING VOIR DIRE

 SLU contends that the trial court erred in allowing the plaintiff's attorney to inquire whether anyone on the panel had an interest in or was employed by Cardinal Glennon's primary and excess insurers. SLU asserts error because 1) all of the insurance companies were located outside of the metropolitan St. Louis area, 2) Cardinal Glennon's primary insurance carrier is a non-stock company with no offices outside Jefferson City, Missouri, and 3) SLU has no insurance coverage available to satisfy the judgment. In chambers prior to voir dire, the defense objected to the plaintiff asking the insurance question. The trial court overruled the objections and allowed the plaintiff to ask the following question during voir dire: "Do you or any member of your family work for or have a financial interest in the Missouri Liability Insurance Association, First State Insurance Company, Lloyds of London, New England Reinsurance Company?"

As a rule "the possibility of taint resulting from some connection between a juror and an interested insurer, even though the disclosure of the latter's interest is unlikely, outweighs the prejudice that might result from an inquiry naming the insurance company during voir dire." *Skinner v. Sisters of St. Mary's*, 686 S.W.2d 858 (Mo.App.1985). A trial judge has broad discretion in determining whether a party may be allowed to ask a question naming insurance companies. *Id.* at 860. If, however, an "insurance question is asked not in good faith but for the purpose of injecting insurance coverage into the minds of the jurors, we recognize the prejudicial effect thereof deprives the defendant of his right to a fair trial." *Id.*

In this case, the judge told the attorneys in chambers prior to voir dire that "[a]s far as the insurance question, you're going to have to go to the appellate court to get relief there. Mr. Nolan you are not to highlight it, put it in one question, and you are to ask the standard question, financial interest and employed by." This is the trial judge's way of saying that counsel was following the accepted procedure for asking the insurance question in Missouri. This includes 1) first getting the judge's approval of the proposed question out of the hearing of the jury panel, 2) asking only one insurance question, and 3) not asking it first or last in a series of questions so as to avoid unduly highlighting the question to the jury panel. This procedure has generally been followed by Missouri trial courts for years. *See* Thomas A. Vetter, Voir Dire II Liability Insurance, *29 Mo. L.Rev.* 305 (1964). The trial judge acted well within his discretion in allowing the one question which was asked. This point is denied.

## VIII. EXCESSIVENESS OF THE VERDICT

 SLU contends that the trial court erred in denying the motion for a new trial due to an excessive verdict. On appeal, a jury's determination of damages will not be disturbed unless the amount is so grossly excessive that it "shocks the conscience of the court." *Eller v. Crowell*, 238 S.W.2d 310, 316 (Mo.1951). Although there is no exact

formula for determining excessiveness of a verdict, each case is considered on its own facts to determine what will "fairly and reasonably compensate" the plaintiff. A jury is in the best position to make this determination. *Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 97 (Mo. banc 1985); *Seabaugh*, 816 S.W.2d at 211. To compensate a plaintiff a jury should consider the following factors: nature and extent of injury, diminished earning capacity, economic condition, plaintiff's age, and awards in comparable cases. Furthermore, a jury is "entitled to consider certain intangibles" which "do not lend themselves to precise calculation," such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss. *Kenton*, 693 S.W.2d at 98. There is a "large range between the damage extremes of inadequacy and excessiveness." *Id.* We will allow a jury "virtually unfettered" discretion if the damages are within that range. *Id.*

■ After the jury makes a determination of damages, the trial judge may find passion and prejudice from an excessive verdict. *See Anderson v. Burlington Northern R. Co.*, 700 S.W.2d 469, 477 (Mo.App.1985). A trial court has great discretion in approving the verdict or setting it aside as excessive. *Dunn v. St. Louis–San Francisco Ry. Co.*, 621 S.W.2d 245, 255 (Mo. banc 1981). Therefore, we will only set a verdict aside if there has been an abuse of discretion by the jury or the trial judge.

■ On appeal, the size of the verdict alone will not establish passion and prejudice by the jury. There must be a showing of some other error at trial. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 615 (Mo. banc 1977). Specifically, appellant must show, first, that the verdict, when viewed in the light most favorable to the prevailing party, was "glaringly unwarranted." *Anderson*, 700 S.W.2d at 477. Second, appellant must show trial error or misconduct by the prevailing party that was responsible for producing the passion or prejudice. *Fowler v. Park*, 673 S.W.2d 749, 758 (Mo. banc 1984). Since we

find no error that would produce passion or prejudice, there is no basis for a new trial.

In addition, SLU asserts that section 538.210, RSMo 1986, provides for non-economic damages caps in medical malpractice cases. Section 538.210 became effective on February 3, 1986. SLU also asserts that section 537.068, RSMo Supp.1992, allows for statutory remittitur by the trial judge. Section 537.068 became effective on July 1, 1987. Because Danny's cause of action accrued prior to the effective date of sections 538.210 and 537.068, these sections will only apply if they operate retrospectively.

■ Under the rules of statutory construction, statutory provisions that are substantive "are generally presumed to operate prospectively, 'unless the legislative intent that they be given retroactive operation clearly appears from the express language of the act or by necessary or unavoidable implication.'" *Dept. of Soc. Services v. Villa Capri Homes*, 684 S.W.2d 327, 332 (Mo. banc 1985), *quoting Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 34 (Mo. banc 1982). *See also Doe v. Roman Catholic Diocese of Jefferson City*, 862 S.W.2d 338 (Mo. banc 1993). On the other hand, "[a] statutory provision that is remedial or procedural operates retrospectively unless the legislature expressly states otherwise." *Wilkes v. Mo. Hwy. and Transp. Comm'n*, 762 S.W.2d 27, 28 (Mo. banc 1988).

■ We need not decide if the caps under section 538.210 are substantive, procedural, or remedial because the issue of retrospective application of section 538.210 was raised for the first time in SLU's brief to this Court. At a minimum, they would have to tender an appropriate damage instruction (*see MAI* 21.03, *MAI* 21.05, and *MAI* 36.21—Form of Verdict). Not only were none of these instructions tendered at the instruction conference, but all the parties agreed to the damage instruction (*MAI* 4.01, modified) and the Form of the Verdict (*MAI* 36.05), none of which submitted caps. The retrospective application of the damage caps also was not raised in the motion for new trial. This issue is not preserved.[6]

6. Because this issue has not been preserved for review, we need not apply the rules of statutory

■ Both defendants made a motion for remittitur, which the trial court properly overruled. SLU is not entitled to remittitur under section 537.068. Although, remittitur is procedural, section 537.068 does not apply retrospectively because section 537.069, RSMo Supp.1992, expressly provides that section 537.068 only applies prospectively. Therefore, SLU's assertion that section 537.-068 should be applied retrospectively is without merit. Also, even if Danny's cause of action had accrued after July 1, 1987, remittitur under section 537.068 would not be available to SLU because section 538.300 provides that section 537.068 "shall not apply to actions under sections 538.205 to 538.230 [tort actions based on improper health care]." SLU's final point is denied.

The judgment of the trial court is affirmed.

All concur.

construction or consider the constitutionality of any retrospective application of section 538.210 under Article I, Section 13, of the Missouri Constitution.