**STATE of Missouri, Respondent,**

v.

**Millard F. MANN, Appellant.**

**No. WD 55586.**

Missouri Court of Appeals, Western District.

June 20, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2000.

---

Irene C. Karns, Asst. Public Defender, Columbia, for appellants.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondents.

Before BRECKENRIDGE, C.J., LAURA DENVIR STITH and RIEDERER, JJ.[1]

PATRICIA BRECKENRIDGE, Chief Judge.

A jury convicted Millard F. Mann of four counts of the class C felony of stealing by deceit, in violation of § 570.030, RSMo 1994,[2] and one count of making a false statement to receive a health care payment, in violation of § 191.905.1. The trial court sentenced Mr. Mann to a total of eight years imprisonment. The trial court also ordered Mr. Mann to pay the State over $45,000.00 as restitution, reimbursement for costs attributable to the investigation and prosecution of the case against

him, and court costs. On appeal, Mr. Mann claims that (1) the evidence was insufficient to support his convictions on all of the counts; (2) the trial court erred in limiting his cross-examination of the State's expert; and (3) the trial court erred in ordering that he pay costs and restitution in excess of $45,000 without first affording him a full and fair hearing.

The judgment of the trial court is affirmed.

### Factual and Procedural History

■ On appeal from a criminal conviction, this court reviews the facts and any inferences therefrom in the light most favorable to the jury's verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995). Mr. Mann was a psychologist practicing in Marshall, Missouri. His office was located in his residence. In 1993, Mr. Mann enrolled as a provider of mental health services in the Department of Social Services Division of Medical Services' psychology and counseling program. Enrollment in the program authorized Mr. Mann to receive payment for services he rendered to Medicaid-eligible persons under the age of twenty-one. All providers enrolled in the program receive a copy of the Medicaid program's Psychology / Counseling Manual (Manual), which contains instructions and guidelines for participation in the program, including proper billing practices. Additionally, the Medicaid program offers a telephone number providers can call to obtain answers to questions about the program, plus educational seminars. Mr. Mann and his former office manager attended one such educational seminar in Columbia, Missouri. The subject of the educational seminar was how to properly complete claim forms in order to receive reimbursement.

On the claim forms, providers are to list, among other things, the patient's name and Medicaid number, the date the service

---

1. Judge Riederer resigned from this court prior to the issuance of this opinion.

2. All statutory references are to the Revised Statutes of Missouri 1994.

was rendered or provided, the place of service, the type and code number of the service provided, the amount of time spent providing that service, and the provider's name and program number. Medicaid reimburses providers based upon the time spent providing the particular type of service.

The program requires that all services provided "must be adequately documented in the medical record." The Manual defines "adequate documentation" and "adequate medical records" as follows:

> Adequate documentation means documentation from which services rendered and the amount of reimbursement received by a provider can be readily discerned and verified with reasonable certainty.

> Adequate medical records are records which are of the type and in a form from which symptoms, conditions, diagnoses, treatments, prognosis and the identity of the patient to which these things relate can be readily discerned and verified with reasonable certainty. All documentation must be made available at the same site at which the service was rendered.

There are six types of services reimbursable under the Medicaid program. These services are (1) individual psychological counseling; (2) family psychological counseling with the child present; (3) family counseling without the child present; (4) diagnostic evaluation and assessment; (5) group therapy; and (6) crisis intervention. The Manual contains definitions and limitations of each type of service, and the maximum amount which is reimbursable for each service. In the Manual, the service of diagnostic evaluation and assessment is defined as the following:

> An assessment service is for the purpose of identifying the treatment needs of the individual or family and ... must include direct patient contact and could include any or all of the following types of activities:

> — Interview with child (includes topics of family, peers, school relationships, behavior, emotions, observation of social skills, developmental level of planning skills and informal assessment of overall development.)
> — Parent report:
> a. Complete child behavior checklist
> b. Interview to complete Vineland Adaptive Behavior Scale or similar rating tool.
> — Teacher report:
> a. Complete form regarding child's development, academic progress, and social adaptive behavior
> b. Complete Conner's Teacher Rating Form.
> c. Child Behavior checklist –
> Teacher's report form

Psychiatrist A.E. Daniel, M.D., the State's expert and a consultant to the Medicaid program since 1984, testified at trial that adequate documentation for an assessment service must consist of identifying the date of the service, the patient's symptoms and history, the provider's diagnosis, a treatment plan, and any follow-up procedures.

The service of crisis intervention is defined in the Manual as:

> A face-to-face contact to diffuse a situation of immediate crisis. The situation must be of significant severity to pose a threat to the patient's well being or is a danger to him/her self or others. Crisis intervention can not be scheduled.

Dr. Daniel testified that examples of crisis situations prompting this type of service are suicide attempts, violence to others, incessant crying, uncontrollable behavior, and the death of a family member or pet. Dr. Daniel emphasized that the service of crisis intervention by definition cannot be scheduled, as a crisis is not planned.

In late 1994, the Surveillance and Utilization Review Unit of Missouri Medicaid (SURS unit) decided to audit Mr. Mann by reviewing the documentation of several of the claims he had submitted. The decision

to audit Mr. Mann was based upon the high number of claims he submitted. At that time, Mr. Mann ranked seventh highest in terms of dollars the program paid to all providers in the state who were enrolled in the program. In January of 1995, Sandra Call of the SURS unit conducted an on-site review of Mr. Mann's patient records. After she was unable to reconcile Mr. Mann's documentation with the claims he submitted, she made copies of all of the files she was reviewing, and referred the case to the Medicaid Fraud Control Unit of the Attorney General's Office.

James Garrison from the Medicaid Fraud Control Unit investigated Mr. Mann. Mr. Garrison subpoenaed Mr. Mann's appointment books and twenty-four of Mr. Mann's patient files. Of the twenty-four files, Mr. Mann gave Mr. Garrison twenty-two complete files and two partial files. Mr. Mann told Mr. Garrison he could not provide a record of any of his appointments because he kept his appointment records on his computer and his computer "crashed," destroying all record of his appointments.

In investigating Mr. Mann's Medicaid practice, the auditors noted that between December 12, 1993, and March 1, 1995, there were fifty-one instances in which Mr. Mann billed Medicaid for more than nine hours in a day. In fact, Mr. Mann billed Medicaid for eighteen hours on one day and twenty-seven and one-half hours on another day. When Mr. Garrison questioned Mr. Mann about the twenty-seven and one-half hour day, his response was that "it wouldn't be possible, obviously, for someone to do twenty-seven and a half hours of service in a 24–hour day."

The State subsequently charged Mr. Mann with seven counts of stealing by deceit in violation of § 570.030, and two counts of knowingly making a false statement to receive a health care payment, in violation of § 191.905. After venue was changed from Saline County to Cooper County, the trial court held a hearing on Mr. Mann's pretrial motion to dismiss and motion in limine to permit Mr. Mann to impeach Dr. Daniel with evidence of Dr. Daniel's alleged motive to testify favorably to the State. The trial court denied both motions.

A jury trial was held on January 27 through 29, 1998. The jury found Mr. Mann guilty of four counts of stealing by deceit and one count of knowingly making a false statement to receive a health care payment. The trial court sentenced Mr. Mann to terms of four years imprisonment on each count. Two of the counts of stealing by deceit are to be served concurrently to each other and to the count of knowingly making a false statement to receive a health care payment. Those counts, in turn, are to be served consecutively to the remaining two counts of stealing by deceit, which are to be served concurrently to each other. Thus, Mr. Mann was sentenced to a total of eight years imprisonment. Mr. Mann filed this appeal.

## Standard of Review

In deciding whether sufficient evidence supports the verdict, as raised by Mr. Mann's first three claims of error, this court must determine whether substantial evidence exists from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993). This court accepts as true all the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregards all evidence and inferences to the contrary. *Id.* Substantial evidence consists of evidence "from which the trier of fact could reasonably find the issue in harmony with the verdict." *State v. Gomez*, 863 S.W.2d 652, 655 (Mo.App. 1993).

## Sufficient Evidence Supports Convictions

### for Stealing By Deceit

In his first and third points on appeal, Mr. Mann contests the sufficiency of the

evidence supporting his convictions on four counts of stealing by deceit. Section 570.030 provides that "a person commits the crime of stealing by deceit if he appropriates property or services of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion." "Deceit," as it is used in this statute, "means purposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind." Section 570.010(6). In his first point, Mr. Mann claims that the evidence was insufficient to support his convictions for stealing by deceit because the State failed to prove that he provided the dates of service entered on the claim forms he submitted and, even if he did provide the dates, the State did not prove that he knew he was supposed to put the dates that the services were actually rendered on the claim forms. In his third point, Mr. Mann claims that the evidence was insufficient to support his convictions for stealing by deceit because the State failed to prove that the Division of Medical Services actually relied on the dates of services he put on the claim forms.

■ The first count of stealing by deceit involved a claim form Mr. Mann submitted regarding services he allegedly provided on February 16, 1994 to K.W. K.W.'s mother testified that on that day, she and her husband took their sons J.W. and K.W. to Mr. Mann's office for a scheduled appointment. J.W., then thirteen years old, had just been released from Charter Hospital, where he was treated for behavioral problems. One of the conditions of J.W.'s release from Charter was that he receive follow-up care. K.W.'s mother and father family planned to have Mr. Mann provide counseling services to J.W. They also thought about having Mr. Mann provide counseling for the whole family; however, Mr. Mann informed them that at three and one-half years of age, K.W. was too young to participate in family counseling.

While at Mr. Mann's, K.W.'s mother spoke briefly with Mr. Mann, and then Mr. Mann and K.W.'s father talked in Mr. Mann's office. Mr. Mann also talked briefly with J.W. in his office. J.W. was not eligible for Medicaid, but K.W. was. Mr. Mann asked K.W.'s mother for K.W.'s Medicaid number, which she provided him. The family then left, after spending approximately one and one-half hours at Mr. Mann's home. Mr. Mann never interviewed K.W. and, in fact, K.W. sat at his mother's feet in the waiting room drawing pictures the entire time the family was in Mr. Mann's office. They did not return to Mr. Mann.

Mr. Mann subsequently submitted a claim form to the Medicaid program on which he listed K.W. as his patient. On the claim form, Mr. Mann billed Medicaid for one hour of crisis intervention, two hours of assessment, three hours of psychological testing, and one hour of family therapy with the patient present, for a total of seven hours of services, which he claimed he provided to K.W. on February 16, 1994. The Division of Medical Services paid Mr. Mann $420 of the $630 he billed for those services.

After reviewing Mr. Mann's file on K.W., Dr. Daniel concluded that the file did not contain documentation to support that Mr. Mann performed any of the services he claimed to have performed for K.W. Mr. Mann's notes did not indicate that K.W. suffered from any crisis, especially in light of the fact that the appointment had been scheduled in advance. There was no documentation of the extent of the assessment services Mr. Mann allegedly provided K.W. Dr. Daniel testified that one of the tests Mr. Mann claimed to have administered to K.W. was not to be administered to children under the age of four unless there was a clear indication of slow cognitive development. Mr. Mann's file contained no documentation indicating that K.W. had slow cognitive development. Although the file did contain some drawings which Mr. Mann alleged K.W. had

done while sitting with his mother in the waiting room of Mr. Mann's office, Dr. Daniel opined that none of the drawings constituted Kinetic Family Drawings or House–Tree–Person Drawings, which are psychological assessment tools. Moreover, according to Dr. Daniel, the array of services Mr. Mann alleged to have provided K.W. in one day was not consistent with appropriate psychological practice. The testimony of K.W.'s mother and Dr. Daniel support a finding that Mr. Mann knowingly and falsely represented to the Division of Medical Services that he had provided seven hours of psychological services to K.W. on February 16, 1994.

■ The second count of stealing by deceit involved a claim form Mr. Mann submitted regarding services he alleged he provided to W.T. on March 22, 1994. W.T.'s father brought him in to Mr. Mann's office on that day after scheduling the appointment two or three weeks in advance. W.T.'s father sought counseling for W.T. because W.T. had been in trouble with the juvenile authorities, and had some discipline and anger problems. Mr. Mann counseled W.T. for forty-five minutes to one hour on that day. W.T. had other appointments with Mr. Mann after that day.

Mr. Mann subsequently submitted a claim form to the Medicaid program on which he billed for one hour of crisis intervention, one and one-half hours of assessment interview and assessment work, and two hours of testing services, for a total of four and one-half hours of services he claimed to have provided to W.T. on March 22, 1994. The Division of Medical Services paid Mr. Mann $270 of the $405 he billed for those services.

Dr. Daniel reviewed Mr. Mann's patient file on W.T. and found that there was no documentation in the file indicating that W.T. was suffering from a crisis on March 22, 1994. Moreover, the appointment had been scheduled two or three weeks in advance. With regard to the assessment and testing services Mr. Mann alleged he had

provided, W.T.'s father testified that he did not recall either he or his son completing any tests on that particular day. This evidence, combined with the fact that W.T.'s father testified that W.T. was with Mr. Mann on that day for only an hour at most, supports a finding that Mr. Mann knowingly and falsely represented to the Division of Medical Services that he provided the four and one-half hours of psychological services he claimed he provided to W.T. on March 22, 1994.

The remaining two counts of stealing by deceit involved services Mr. Mann alleged he provided to various Medicaid recipients on March 9, 1994 and December 18, 1994. Mr. Mann submitted claim forms for ten different patients on which he billed Medicaid for services he alleged he provided them on March 9, 1994, and claim forms for seven different patients on which he billed Medicaid for services he alleged he provided them on December 18, 1994. Mr. Mann billed Medicaid for twenty-seven and one-half hours on March 9, 1994, and eighteen hours on December 18, 1994. The Division of Medical Services paid Mr. Mann $1,625 for the March 9, 1994 services, and $1,080 for the December 18, 1994 services.

■ Three of the children for whom Mr. Mann claimed to have provided services on March 9, 1994 were siblings A.S., A.S., and T.S. Mr. Mann billed for twelve hours of services to these children for that day. Dr. Daniel reviewed Mr. Mann's files regarding A.S., A.S., and T.S., and found that the documentation Mr. Mann had for March 9, 1994 was minimal in comparison to the amount of services Mr. Mann claimed to have provided on that date. Mr. Mann claimed to have provided testing, assessment, and counseling services to the three children; however, Dr. Daniel testified that it was unusual in the practice of psychology to subject young children to psychological testing and assessment on the same day. Although the files did contain treatment plans for the children which

were labeled with dates other than March 9, 1994, Dr. Daniel testified that the plans for all three children were virtually identical except for the diagnosis, as if the plans had been generated from a computer. According to Dr. Daniel, the purpose of diagnostic evaluation and testing is to formulate an individualized treatment plan for the patient, and he would not expect all three children to have the exact same behaviors warranting the exact same treatment plan.

A reasonable inference from Dr. Daniel's testimony is that Mr. Mann knew he did not provide the services to A.S., A.S., and T.S. on March 9, 1994 for which he billed Medicaid, and he attempted to cover up his crime by creating false documentation. This inference is also supported by Ms. Call's testimony that the files she reviewed and copied when she audited Mr. Mann looked different from the files Mr. Mann produced to Mr. Garrison in response to the subpoena, even though the files concerned the same patients. Dr. Daniel's testimony, combined with the physical impossibility that he could provide twenty-seven and one-half hours of services in a twenty-four hour day, support a finding that Mr. Mann knowingly and falsely represented to the Division of Medical Services that he provided twenty-seven and one-half hours of psychological services to various Medicaid recipients on March 9, 1994.

■ Similarly, although it was physically possible for Mr. Mann to have provided the eighteen hours of services on December 18, 1994 for which he billed Medicaid, the jury could reasonably infer that he did not do so. To have provided eighteen hours of services in one day, Mr. Mann would have had to have worked *non-stop* from, for example, 6:00 in the morning until midnight. While Mr. Mann's office manager testified that on infrequent occasions, Mr. Mann counseled patients until "close to midnight," there was no evidence that Mr. Mann began his work day at 6:00 a.m. Moreover, Mr. Mann's appointment records could have verified whether Mr. Mann did, in fact, provide the services he claimed to have provided that day, as twelve of the eighteen hours were for individual and family therapy, and four were for testing. Mr. Mann claimed his appointment records were destroyed, however, when his computer crashed. Again, the jury could reasonably infer that Mr. Mann did not perform the eighteen hours of services he claimed to have provided on that day, and was trying to cover up his crime. There was sufficient evidence to support a finding that Mr. Mann knowingly and falsely represented to the Division of Medical Services that he provided eighteen hours of psychological services to various Medicaid recipients on December 18, 1994.

■ In response to the substantial evidence presented by the State supporting his convictions for stealing by deceit, Mr. Mann's theory of defense is that he actually provided the services he claimed to have provided, but on different dates than what he furnished on the claim forms. To support his theory, Mr. Mann first argues that there was no evidence that he provided the dates of service which were entered on the claim forms. Both Mr. Mann's former office manager and current office manager testified, however, that they completed the Medicaid claim forms using information supplied by Mr. Mann on blue sheets contained in the patient files. The files admitted into evidence at trial included the blue sheets, which have a notation in the upper right-hand corner of the services provided, the date of the services, and the amount of time to bill for the services. Contrary to Mr. Mann's assertions, the evidence establishes that the information regarding the dates of services was supplied by Mr. Mann.

Mr. Mann alternatively argues that even if the evidence established that he furnished the dates of service, there was no evidence that he knew the date of service space on the claim form was supposed to indicate the dates that the services were

actually provided. The space for entering the date is clearly labeled, "DATE(S) OF SERVICE." The Manual contains instructions for completing the claim form, and the instruction on filling in the date of service space states, "Enter the date of service under 'from' in month/day/year format, using six-digit format." Mr. Mann acknowledges this instruction, but contends that the date of service space on the claim form is confusing because it contains a "from" and a "to" column. He argues that the existence of a "to" column means that providers can bill for services rendered over several days by indicating a beginning date in the "from" column and an ending date in the "to" column.

Mr. Mann did not enter dates under both the "from" and "to" columns on the claim forms, however. The evidence was that Mr. Mann listed one date under the "from" column. Additionally, although Mr. Mann also claims that he was simply following another section of the Manual which he interpreted to require the ending date of services provided over a period of days, the dates on the documentation Mr. Mann produced to support his contention that he actually provided the services were not consistently prior to the date of service he entered on the claim form. The jury could reasonably infer that had Mr. Mann truly believed that he was supposed to enter the ending date of services provided over a period of time, his documentation of the services rendered would have listed dates prior to, but not after, the date of service he furnished on the claim form.

Furthermore, Ms. Call testified that the program instructs all providers that they are to put on the claim form the date that the service was actually provided. Mr. Mann's former officer manager testified that she and Mr. Mann attended one of the Medicaid program's educational seminar on the subject of how to properly complete a claim form. The evidence was sufficient to support a finding that Mr. Mann knew he was supposed to put the date that the services were actually rendered. Mr. Mann's first point is denied.

■ In his third point, Mr. Mann claims that the evidence was insufficient to support his convictions for stealing by deceit because the State failed to prove that the Division of Medical Services relied on the incorrect dates he provided. Mr. Mann argues that because the Medicaid program's computer system is not set up to alert the Division of Medical Services, prior to payment of the claims, that a provider is billing for an excessive number of hours on a particular date, the dates furnished by the providers on the claim forms are not material.

That Medicaid's computer system does not catch incorrect dates prior to paying the claims does not make the dates immaterial. The State can recoup Medicaid funds which were incorrectly or wrongfully paid through criminal and civil actions. These recoupment actions occur after the Division of Medical Services has audited a provider's files. Ms. Call, of the SURS unit, testified that when auditing a provider's files, she compares the dates furnished on the claim forms to the provider's documentation of services rendered on that date to determine if they match. Thus, the Division of Medical Services relies on the dates furnished by the providers to verify that the providers actually provided the services claimed. It is reasonable to infer, as the State argues, that the Division also relies on the dates to determine whether the particular services were necessary or appropriate, whether the patient was eligible for Medicaid on that date, and whether a provider is double-billing. Presumably, this is why the Manual requires that all services be adequately documented, which means the services can be "readily discerned and verified with reasonable certainty." The State presented sufficient evidence that the Division of Medical Services relied on the dates Mr. Mann furnished on the claim forms. Mr. Mann's third point is denied.

### Sufficient Evidence Supports Conviction for Knowingly Making A False Statement to Receive a Health Care Payment

In his second point, Mr. Mann claims that the evidence was insufficient to support his conviction for one count of knowingly making a false statement to receive a health care payment based upon his representing to the Division of Medical Services that he had provided psychological services to B.M.O. on February 20, 1995. Section 191.905.1 makes it a crime for a health care provider to "knowingly make or cause to be made a false statement or false representation of a material fact in order to receive a health care payment." Section 191.900(3) defines "false" as "wholly or partially untrue." Mr. Mann claims that the evidence fails to establish beyond a reasonable doubt that Mr. Mann knew what date was entered in the date of service field on the claim form, or that the date entered, February 20, 1995, was incorrect because the date of service field was supposed to indicate the dates that he actually provided the services.

The evidence supporting the conviction on this count was provided by the testimony of B.M.O.'s mother, R.F. R.F. testified that she and her boyfriend, W.O., went to Mr. Mann's office on February 20, 1995, for the purpose of obtaining relationship counseling. B.M.O., R.F. and W.O.'s three-year-old son, did not go with them. Mr. Mann met R.F. and W.O. in the waiting area of his office, and asked R.F. for her Medicaid number and B.M.O.'s Medicaid number.

R.F. and W.O. were at Mr. Mann's office for approximately forty-five minutes. During this time, W.O. spoke alone with Mr. Mann in his office for five minutes, but R.F. did not go in Mr. Mann's office at all. Instead, R.F. stayed in the waiting area filling out forms Mr. Mann told her to complete. Some of the forms Mr. Mann had R.F. complete consisted of the last pages from various multiple-page tests concerning her child's behavior. Although

R.F. mentioned to Mr. Mann that B.M.O. had Attention Deficit Disorder, neither R.F. nor W.O. asked Mr. Mann to provide any kind of counseling services for them with regard to B.M.O. at that time. In fact, Mr. Mann indicated that after R.F. and W.O. had worked through their relationship problems, they could incorporate B.M.O. in their counseling. R.F. and W.O. never returned to Mr. Mann's office after February 20, 1995, however, because R.F. did not feel comfortable there.

Mr. Mann subsequently submitted a claim form to the Medicaid program on which he billed for one hour of assessment activities and two hours of psychological testing he said he had provided to B.M.O. on February 20, 1995. The Division of Medical Services paid Mr. Mann $180 of the $270 he billed.

Dr. Daniel reviewed B.M.O.'s file and found no information in Mr. Mann's notes regarding B.M.O., other than the notation, "Is he ADD?" Rather, the subject of Mr. Mann's notes was the relationship of R.F. and W.O. The file did contain a completed Attention Deficit Disorder test-scoring sheet; however, R.F. testified that she did not complete the form and she did not know who did. The testimony of R.F. and Dr. Daniel support a finding that Mr. Mann knowingly made a false representation to the Division of Medical Services that he provided three hours' worth of services to B.M.O. on February 20, 1995, in order to receive reimbursement from the Medicaid program. Mr. Mann's second point is denied.

### No Error in Restricting Mr. Mann's Cross–Examination of State's Expert

In his fourth point, Mr. Mann claims that the trial court erred in limiting his cross-examination of the State's expert witness, Dr. Daniel. Prior to trial, Mr. Mann filed a motion in limine in which he asked the court to allow him to question Dr. Daniel, who was employed as a medi-

cal director at Charter Hospital, about his personal Medicaid billings. Mr. Mann also wanted to ask Dr. Daniel about Charter Hospital's Medicaid billings, including the fact that Charter billed over $13 million to Medicaid from 1993 to 1997, and in 1997, the Division of Medical Services recouped from Charter approximately $271,000 in amounts Charter had overbilled for hospital stays.

At the hearing on the motion, Mr. Mann argued that because Medicaid was paying funds to Charter, and Charter was paying Dr. Daniel a salary, Dr. Daniel would be biased to testify favorably to the State. Mr. Mann also argued that because Charter had to pay back the amount it had overbilled, Dr. Daniel would have a motive to testify favorably to the State because of the potential that he could be prosecuted for Medicaid fraud. In response, the State contended that Charter's overbilling was the result of the Medicaid program's disallowance of payment for more than a certain number of in-patient days, and there was no evidence that Charter's overbilling was fraudulent. Furthermore, the State argued, Dr. Daniel testified that he was not involved with Charter Hospital's billing practices, and there was no evidence that Dr. Daniel's salary was in any way influenced by Charter Hospital's Medicaid billings. The court overruled Mr. Mann's motion in limine, but stated that the issue could be reconsidered at trial based upon the evidence adduced.

At trial, the court allowed Mr. Mann to cross-examine Dr. Daniel about the amount of his personal Medicaid billings from 1993 to 1997. Mr. Mann was also allowed to question Dr. Daniel about the salary he receives from Charter Hospital as its medical director. The trial court did not, however, allow Mr. Mann to question Dr. Daniel about Charter's Medicaid billings or the Division of Medical Services' recoupment of amounts Charter had overbilled Medicaid for hospital stays. As his offer of proof on this issue, Mr. Mann offered into evidence records showing the amount of compensation the Division of Medical Services had paid to Dr. Daniel and to Charter Hospital through the Medicaid program. Mr. Mann contends on appeal that the trial court's limiting his cross-examination of Dr. Daniel violated his constitutional right to confront the witnesses against him.

The trial court is vested with broad discretion in determining the scope of cross-examination on issues that may be pertinent to a witness's credibility. *State v. Dunn*, 817 S.W.2d 241, 245 (Mo. banc 1991). "Among the reasons for permitting trial judges wide latitude for the purpose of imposing reasonable limits on cross-examination are concerns about prejudice, confusion of the issues, and interrogation that is only marginally relevant." *Id.* The trial court's exclusion of "offers of impeachment on immaterial or collateral matters" does not constitute an abuse of discretion. *State v. Taylor*, 944 S.W.2d 925, 935 (Mo. banc 1997).

Mr. Mann argues that his cross-examination questions to Dr. Daniel were relevant to demonstrate Dr. Daniel's bias and interest in testifying favorably to the State. A witness's bias or interest toward a party " 'are never irrelevant matters ....,' " and may be proved through extrinsic evidence. *State v. Johnson*, 700 S.W.2d 815, 817 (Mo. banc 1985) (quoting *State v. Edwards*, 637 S.W.2d 27, 29 (Mo. 1982)). Nevertheless, "the authority of a party, and in particular a criminal defendant, to show the existence and extent of a witness'[s] bias, prejudice or hostility is subject to the sound discretion of the trial court." *Id.*

Mr. Mann relies on *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852 (Mo. banc 1993), to support his claim that his questions to Dr. Daniel regarding the amount of Charter's Medicaid billings and the Division of Medical Services' recoupment of Charter's overbilling were relevant to demonstrate Dr. Daniel's bias. In *Callahan*, the Supreme Court held that it

was permissible for the tort plaintiff's counsel to question the defendant's expert witness regarding large research grants the expert had received from Lederle Laboratories, a former defendant in the case and the manufacturer of the vaccine which had contributed to the plaintiff's injuries. *Id.* at 869. The expert's trial testimony was based upon an editorial the expert had published which reflected favorably on Lederle. *Id.* The Court found that such "evidence was admissible to show possible prejudice or bias." *Id.*

■ *Callahan* does not aid Mr. Mann. Like the plaintiff in *Callahan*, Mr. Mann was able to elicit evidence from Dr. Daniel regarding the financial benefit he received through the Medicaid program from the State, the party for whom he was testifying favorably. The court allowed Mr. Mann to cross-examine Dr. Daniel about the amount of his personal Medicaid billings and reimbursement from 1993 to 1997. The court did not, however, allow Mr. Mann to question Dr. Daniel about Charter Hospital's Medicaid billings because Mr. Mann failed to establish that Dr. Daniel received any financial benefit from Charter's Medicaid billings. Dr. Daniel's set salary as a medical director at Charter was not based upon or affected by the amount of money Charter Hospital billed or was reimbursed by the Medicaid program. Without the establishment of some kind of a connection between Charter's Medicaid billings and Dr. Daniel, the only evidence that was relevant to the issue of Dr. Daniel's possible interest in testifying favorably to the State was the amount of his own Medicaid billings and reimbursement.

■ As for Mr. Mann's claim that evidence of Division of Medical Services' recoupment of Charter's overbilling Medicaid for hospital stays was relevant to show Dr. Daniel's motive to testify favorably to the State out of fear of being subject to prosecution, there was no evidence that Dr. Daniel was involved in Charter's overbilling Medicaid for hospital stays, or that

Dr. Daniel was even involved in Charter's billings. Mr. Mann failed to establish a link between Dr. Daniel and Charter's Medicaid billings and overbillings. Therefore, because Charter's Medicaid billings and overbillings were not probative of any potential bias or interest on the part of Dr. Daniel, the trial court did not abuse its discretion in refusing to permit Mr. Mann to cross-examine Dr. Daniel on the subject. Mr. Mann's fourth point is denied.

### Mr. Mann Waived Full Hearing on Motion for Restitution, Reimbursement and Cost

In his fifth point, Mr. Mann alleges error in the trial court's granting the State's motion for restitution, reimbursement for the costs of the investigation and prosecution, and court costs. The court ordered Mr. Mann to pay the full amount requested by the State, which was $45,139.81, plus any court costs assessed by the clerk of the court. The $45,139.81 included $32,217.36 in restitution, $9,501.11 as reimbursement for the cost of the investigation and prosecution of the case, $2,735 in costs of research incurred at the request of and on behalf of Mr. Mann, and $686.34 in court reporter fees for transcribing the trial testimony.

■ Mr. Mann claims that the court's ordering him to pay restitution and costs in excess of $45,000.00 violated his right to due process of law, as guaranteed by the United States and Missouri Constitutions. Procedural due process requires that before a person is deprived of a property interest, he or she "must receive notice and an opportunity for a hearing appropriate to the nature of the case." *Moore v. Board of Educ. of Fulton School*, 836 S.W.2d 943, 947 (Mo. banc 1992). Mr. Mann does not argue that he received insufficient notice of the hearing on the assessment of costs and reimbursement. Rather, he argues that he was denied the opportunity for a full and fair hearing. He nowhere explains where or how he was

denied such a hearing. Nor does he identify any point at which he asked for an additional opportunity for a hearing on the State's request for restitution and costs.

 To the contrary, the record shows that he affirmatively waived any right to a further hearing. More specifically, at the post-trial hearing, the State presented a motion and attachments showing the cost of the Medicaid Fraud Control Unit's investigation of Mr. Mann, the invoices from the court reporters who transcribed the trial testimony, the cost incurred by the SURS staff researching Charter Hospital's Medicaid billings at Mr. Mann's request, the cost incurred by the SURS staff photocopying records at Mr. Mann's request, and Dr. Daniel's expert witness fees. A witness for the State was present and ready to testify as to the calculation of the restitution amount, but did not do so. The trial court commented that it was appropriate to call the witness since Mr. Mann disputed the calculations of the amounts requested by the State. The trial court then asked counsel for Mr. Mann if the court's belief was correct. Defense counsel did not state that he believed this witness, or any other witness, was needed. His only response was to present legal argument on the specifics of the State's motion for restitution and expenses.

Mr. Mann's counsel argued at the hearing that he disagreed with the $32,217.36 restitution amount, because on the five counts upon which Mr. Mann was convicted, Medicaid had paid Mr. Mann a total of $3,550.00.[3] Mr. Mann's counsel also argued that he did not believe (1) that Mr. Mann should have to pay for the cost of his incarceration;[4] (2) that the amount of $8,076 for work time spent by the Medicaid Fraud Control Unit investigators of the attorney general's office in connection with the case was necessary or warranted;

(3) that the copying charges of 50 cents a page plus charges for the individuals to make the copies were appropriate; or (4) that Mr. Mann "was financially able to pay much of anything these days."

After hearing Mr. Mann's counsel's argument, the trial judge stated that he was "going to take the State's motion under advisement as to the amount of the cost. And as I understand, [defense counsel], you don't desire any testimony at this time. So——." Once again, defense counsel's only response was to argue against specific requests in the motion. The trial court reasonably concluded from this exchange with Mr. Mann's counsel that he did not "desire any testimony at this time." We are directed to no other point at which Mr. Mann requested a fuller hearing. From the record, we conclude that Mr. Mann, although presented with the opportunity for a full hearing on the State's motion, waived his right to any further presentation of evidence by the State and made no attempt to offer other evidence of his own. For these reasons, the trial court's assessment of reimbursement and costs against Mr. Mann did not violate his procedural due process rights. Mr. Mann's fifth point is denied.

The judgment of the trial court is affirmed.

LAURA DENVIR STITH, J., concurs.

---

**3.** Mr. Mann cites no cases or other authorities addressing whether the amount of restitution permitted under § 191.905.10 can exceed the amounts underlying the guilty verdict, and we do not reach the merits of that issue.

**4.** The State's motion does not include a request for Mr. Mann to pay the cost of his incarceration.