**STATE of Missouri, Respondent,**

v.

**Joseph M. CALLEN, Appellant.**

**No. WD 60544.**

Missouri Court of Appeals,
Western District.

Dec. 10, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 28, 2003.

Application for Transfer Denied
March 4, 2003.

Rosalyn Koch, Assistant State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Philip M. Koppe, Assistant Attorney General, Kansas City, MO, for respondent.

Before BRECKENRIDGE, P.J., HOWARD and HOLLIGER, JJ.

PATRICIA BRECKENRIDGE, Judge.

The trial court convicted Joseph Callen of committing a hate crime, § 557.035.2, RSMo 2000,[1] by trespass in the first degree, § 569.140, and sentenced him to four years in prison. On appeal, Mr. Callen raises two points. First, he claims the

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

State failed to prove that there was a victim of his act of trespass whose status could be used to enhance his crime under the hate crime statute. Second, he argues the evidence was insufficient to support the hate crime conviction because there was no evidence that his trespass was motivated by race. Because this court finds that the evidence is sufficient to support a finding that the agent of the corporate owner of the property was a victim of Mr. Callen's trespass and Mr. Callen's trespass was motivated by the agent's race, the judgment is affirmed.

## Factual and Procedural Background

█ On appeal from a criminal conviction, this court reviews the facts and any inferences therefrom in the light most favorable to the verdict. *State v. Mann*, 23 S.W.3d 824, 827 (Mo.App.2000). Applying this standard, the evidence is that in 1990, Mr. Callen, who is Caucasian, went to the Miles Plasma Center in St. Joseph and asked to be a donor. At that time, Sharon Weston, an African–American, was the front-desk supervisor. While Ms. Weston processed his application, Mr. Callen walked around and placed Ku Klux Klan pamphlets throughout the lobby. Ms. Weston told Mr. Callen that the center had a "no soliciting" policy and Mr. Callen could not leave his pamphlets in the building. Mr. Callen then donated plasma.

Mr. Callen returned to the center forty-eight hours later and again left KKK pamphlets in the lobby. The center placed a written warning in Mr. Callen's chart and told him not to leave the pamphlets at the facility because the center would not tolerate it. Nevertheless, Mr. Callen went back to the plasma center two years later in 1992 and again set out KKK pamphlets. At that time, Ms. Weston permanently rejected Mr. Callen from donating at the center. When Ms. Weston informed Mr. Callen that he was permanently rejected, he told her that "he did not like blacks, he did not like n--g-rs."

Despite being told that he could not donate plasma at the center, Mr. Callen returned to the center six months later and asked to donate. When Ms. Weston reminded him he was permanently rejected from donating plasma at the center and was not allowed "on the facility," Mr. Callen became belligerent. Ms. Weston then called the police and signed a complaint for trespass, for which Mr. Callen was prosecuted in municipal court.

Even after this incident, Mr. Callen continued to visit the plasma center two to three times a year. Each time he returned, Ms. Weston informed him that he was not allowed on the premises or in the parking lot. Mr. Callen always refused to leave and would humiliate Ms. Weston with racist remarks. To get Mr. Callen to leave, Ms. Weston pretended to call the police.

In January 2000, the plasma center moved to a new address in St. Joseph and changed its name to Sera–Tec Biologicals. Ms. Weston became the manager of Sera–Tec. In March 2000, Mr. Callen appeared in the lobby wearing camouflage clothing and a hat with the initials "KKK" on it. Ms. Weston told him to leave the building. Mr. Callen asked her why he had to leave, and Ms. Weston told him that he was not allowed in building or in the parking lot. Mr. Callen left the building but sat in his truck in the parking lot. Ms. Weston went out to the parking lot and told him to leave or she would call the police. Mr. Callen again insisted that Ms. Weston tell him why he needed to leave. Ms. Weston finally said, "No, Joe, you know why." Ms. Weston then went back inside the building and pretended to call the police. Mr. Callen left after approximately fifteen minutes.

On May 10 or 11, 2000, Mr. Callen called the plasma center. Another employee answered the telephone. Mr. Callen identified himself and asked to speak to the manager. The employee transferred his call to Ms. Weston, who spoke to him. Mr. Callen called back a short time later and asked for "Diana." When the employee informed him that no "Diana" worked at the center, Mr. Callen asked, "Well, who is that black lady?" The employee told him she was Sharon Weston. Mr. Callen then asked if the address was still "1602 North Woodbine." When told that it was, he said, "Okay, that's all I need for now."

On May 12, 2000, Mr. Callen returned to the center, again wearing a camouflage outfit and a KKK hat. Ms. Weston asked another employee to tell Mr. Callen to leave, but the employee was busy, so Ms. Weston told Mr. Callen to leave. Mr. Callen asked, "Why? Just tell me why." Ms. Weston told him that she did not "have to get into that" and she would call the police if he did not leave. When Ms. Weston began dialing the telephone, Mr. Callen went to his truck, which had "KKK" marked on it and a white KKK flag on the antenna. Mr. Callen sat in his truck for ten minutes before leaving.

Later that day, Mr. Callen called Ms. Weston and told her that she needed to tell him why he could not come to the center. Ms. Weston told him that he knew why. Mr. Callen repeated his question, and Ms. Weston told him she was "not going to go through it" again. She then hung up the telephone, and when he called back a second time, she refused to take the call.

The following Sunday, Ms. Weston went into her office and found a letter on her desk, addressed to her. The letter was written on KKK stationery, and read:

White Knights of the Ku Klux Klan
P.O. Box 451
Saint Joseph Missouri 64502–0451
FRIDAY MAY 12, 2000
(816)–279–5785
SHARON WESTON,
YOU LOUSEY, FILTHY, STINKING N--G-R B-T-H. DO NOT FLATTER YOURSELF BY THINKING YOU CAN USE THIS LETTER I'M SENDING TO YOU AS PROOF THAT I'M THREATENING YOUR LIFE, HEALTH OR WELL BEING. I'M NOT DOING ANY OF THAT. I'M JUST DELIVERING SOME INFORMATION. YOU CANNOT PERSECUTE THE MESSENGER BECAUSE OF THE MESSAGE. AFTER CONSULTING WITH FELLOW ASSOCIATES OF MY PARTICULAR REALM, THEY HAVE COME TO THE CONCLUSION THAT YOU ARE WORTHY OF PROVIDING FUN FOR THE KLAN. WHITE POWER YOU F--KING SPOOKY COON.

/s/ Joseph M. Callen

The letter scared Ms. Weston so much that she had to leave the office. She was afraid that Mr. Callen was outside the building, and she was afraid of what he might do to her.

The next day, Ms. Weston gave the letter to the police. When the police and the FBI questioned Mr. Callen about the letter, he denied writing it or having someone send it for him. When he read the letter, he started laughing and said that it "was good." He admitted that he had created his own KKK stationery, but said a friend must have stolen it and written the letter to get him into trouble. Mr. Callen refused to name this friend.

During the interview, Mr. Callen acknowledged that he had been barred from the plasma center at one point but he said that he did not think he had been barred

for life. Mr. Callen claimed that Ms. Weston barred him from the center because she did not like his politics and because he wore KKK items. He denied that Ms. Weston asked him to stop distributing KKK pamphlets at the center and insisted that he never distributed such pamphlets. Mr. Callen said he only left a business card in one of the restrooms on one occasion. Throughout the interview, he never referred to Ms. Weston by her name but referred to her only as "n--g-r."

The next day, the officers went to Mr. Callen's residence and Mr. Callen gave them some of his blank stationery with the KKK letterhead. The officers could see indentations on one of the sheets of stationery. When they held the blank sheet up to the light, they could read the letter to Ms. Weston. Lab tests confirmed that the writing on the actual letter and the impression of the writing on the blank sheet were identical.

After the investigation, the State charged Mr. Callen with first degree trespass, § 569.140, and the offense was enhanced to a class D felony under the hate crime statute, § 557.035.2. Mr. Callen filed a motion to dismiss, challenging the constitutionality of § 557.035. The trial court granted the motion, and the State appealed. In *State v. Callen*, 45 S.W.3d 888, 890 (Mo. banc 2001), the Supreme Court upheld the constitutionality of § 537.035 and remanded the case.

On remand, a bench trial was held. The trial court found Mr. Callen guilty of the class D felony of hate crime by trespass in the first degree and sentenced Mr. Callen to four years in prison. This appeal followed.

### Standard of Review

██ This court reviews the sufficiency of the evidence in a court-tried criminal case by applying the same standard used in a jury-tried case. *State v. Rehberg*, 919 S.W.2d 543, 552 (Mo.App.1995). Appellate review of the sufficiency of the evidence to support a guilty verdict is limited to a determination of whether the State presented sufficient evidence from which the trier of fact could have reasonably found the defendant guilty. *Id.* In determining whether the conviction is supported by sufficient evidence, the court examines the evidence and inferences in the light most favorable to the verdict, ignoring all contrary evidence and inferences. *State v. Martin*, 940 S.W.2d 6, 8 (Mo.App.1997). The function of the reviewing court is not to reweigh the evidence, but to determine if the conviction is supported by sufficient evidence. *Id.* This same standard applies to the court's review of both direct and circumstantial evidence. *State v. Kee*, 956 S.W.2d 298, 300–01 (Mo.App.1997).

### Sufficient Evidence Ms. Weston was Victim of Trespass

██ In his first point, Mr. Callen argues that the State failed to prove that Ms. Weston was a victim of his act of trespass and, therefore, her status could not be used to enhance his crime to a class D felony under § 557.035.2. Section 557.035.2 provides that the crime of trespass, among other enumerated crimes, may be enhanced if the State believes the crime was "knowingly motivated because of race, color, religion, national origin, sex, sexual orientation or disability of the victim or victims[.]" Section 557.035.2 does not define the word "victim."

Because § 557.035.2 does not define the word "victim," Mr. Callen contends that the statute is referring to the victims of the enumerated crimes. The crime of trespass is defined in § 569.140.1, which provides that "[a] person commits the crime of trespass in the first degree if he knowingly enters unlawfully or knowingly

remains unlawfully in a building or inhabitable structure or upon real property." One way a person enters or remains unlawfully on the property is if "notice against trespass is given by actual communication to the actor." § 569.140.2.

Mr. Callen does not dispute that on May 12, 2000, Ms. Weston told him he was not allowed on the property. He argues, however, that the victim of a trespass is only the person with the right to possess the property, citing *St. Louis County v. Stone*, 776 S.W.2d 885, 888 (Mo.App.1989) (defining a trespass as "an invasion which constitutes interference with possession"). Therefore, he contends that Ms. Weston cannot be a "victim" under § 557.035.2 because she had no possessory interest in the plasma center.

■ Contrary to Mr. Callen's contention, however, even if the definition of a "victim" of a trespass extends only to a person with the right to possess, which is not clear from § 569.140, the evidence is sufficient to establish that Ms. Weston was a victim of Mr. Callen's trespass. The evidence reveals that Ms. Weston worked as a manager for Sera–Tec Biologicals, a corporation. "A corporation, being an artificial person created by operation of law, can act only through its officers, directors and agents." *Schneider v. Schneider*, 347 Mo. 102, 146 S.W.2d 584, 589 (1940). *See also Valentine–Radford, Inc. v. Am. Motorists Ins. Co.*, 990 S.W.2d 47, 54 (Mo. App.1999) (stating that "[i]t is well-settled that a corporation is an artificial entity that can act only through its agents and employees"). The court in *Stone* recognized the legal principle that the agent of a corporation is in possession of the corporate property. *See Stone*, 776 S.W.2d at 888. As manager of the plasma center, Ms. Weston acted as an agent for Sera–Tec, the corporate owner of the property. She controlled the day-to-day operations of the center and had the authority to permanently reject people, like Mr. Callen, from the premises. By continuing to come to the center despite Ms. Weston's orders, Mr. Callen interfered with her right to control and possess the property as an agent for Sera–Tec. Thus, even if, as Mr. Callen contends, the definition of a victim of trespass is limited to only persons with the right to possess the property, Ms. Weston met that definition. Therefore, Ms. Weston's status could be used to enhance his trespass to a hate crime under § 557.035.2. Mr. Callen's first point is denied.

### Sufficient Evidence Trespass Motivated by Race

■ In his second point, Mr. Callen argues there was insufficient evidence that his trespass was motivated by Ms. Weston's race, which was required to enhance the trespass to a hate crime under § 557.035.2. Instead, he contends that his reason for going to the plasma center on May 12, 2000, was to donate plasma. He argues further that he never attempted to speak to Ms. Weston on May 12, and there was no evidence that he was aware that he would encounter Ms. Weston on that day.

■ "Direct proof of a required mental state is seldom available and such intent is usually inferred from circumstantial evidence." *State v. Brown*, 660 S.W.2d 694, 699 (Mo. banc 1983). "The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *State v. Hineman*, 14 S.W.3d 924, 927–28 (Mo. banc 1999). Thus, Mr. Callen's motive for trespassing at the plasma center on May 12 can be inferred from his conduct before, during, and after that day.

Viewing the evidence in the light most favorable to the verdict, the evidence indi-

cates that in 1992, Ms. Weston permanently rejected Mr. Callen from donating at the plasma center for distributing KKK pamphlets. Despite being advised that he was permanently rejected, Mr. Callen continued to visit the plasma center every three to six months. Every time he went to the center, Ms. Weston told him to leave and did not allow him to donate plasma. On each occasion, Mr. Callen made racist remarks to Ms. Weston. He also, on several occasions, wore a KKK hat and displayed KKK paraphernalia.

On May 12, 2000, Mr. Callen again went to the center, although Ms. Weston had informed him as recently as March 2000 that he was not allowed on the property. In addition, Mr. Callen knew that Ms. Weston had not permitted him to donate plasma since she advised him in 1992 that he was permanently rejected from the center. Although Mr. Callen claims that he did not know Ms. Weston would be at the center that day and did not ask to see her, he encountered her every time he went to the center. On May 12, Mr. Callen wore his KKK hat and drove a truck with KKK marked on it and a KKK flag hanging from the antenna. After Ms. Weston told him to leave, Mr. Callen sat in that truck in the parking lot for ten minutes before leaving.

Following the events of May 12, Ms. Weston received a racist letter from Mr. Callen on KKK stationery. Although Mr. Callen denied sending the letter, lab tests confirmed that the imprint of the letter to Ms. Weston was on Mr. Callen's blank KKK stationery. In addition, the evidence showed that a few days before Ms. Weston received the letter, Mr. Callen called the center, asked for Ms. Weston's name, and verified the center's address.

Mr. Callen's conduct before, during, and after May 12 manifests his racial animosity towards Ms. Weston. *Hineman,* 14 S.W.3d at 927–28. Thus, viewing the evidence in the light most favorable to the verdict, the trial court could have reasonably found that Mr. Callen's trespass on May 12, 2000, was motivated by Ms. Weston's race. Mr. Callen's second point is denied.

The judgment of the trial court is affirmed.

All concur.