

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STEPHANIE CLARK, | ) | No. ED110638 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | 1811-CC00191 |
| | ) | |
| SSM HEALTHCARE ST. LOUIS, D/B/A/ | ) | Honorable Michael J. Fagras |
| SSM HEALTH ST. JOSEPH HOSPITAL, | ) | |
| WENTZVILLE, DAWN HOLEMON, M.D., | ) | |
| LEE M. FREUND, D.O., and ST. | ) | |
| CHARLES EMERGENCY GROUP, LLC, | ) | |
| | ) | |
| Respondents. | ) | Filed:  March 7, 2023 |

Kelly C. Broniec, P.J., Philip M. Hess, J., and James M. Dowd, J.

## OPINION

This medical negligence/wrongful death case arose on April 20, 2016, when Destiny Gleason (hereinafter D.G.), the fourteen-year-old daughter of appellant Stephanie Clark, committed suicide.  The evening before, D.G. had become suicidal and was taken to the SSM Health St. Joseph Hospital emergency room in Wentzville, Missouri where she came under the care of Respondents SSM Healthcare St. Louis, d/b/a/ SSM Health St. Joseph Hospital, Dr. Dawn Holemon, Dr. Lee Freund, and St. Charles Emergency Group, LLC.  Psychiatric evaluation took place and D.G. was released later that evening.  She hung herself from a pull-up bar the next morning and died a few days later.

Appellant Clark's petition alleged that Respondents' psychiatric evaluation and the decision to discharge D.G. from the hospital fell below the standard of care for health care providers under the same or similar circumstances and caused or contributed to cause D.G.'s death.

In granting summary judgment in favor of Respondents, the trial court held that (1) under the court's interpretation of Missouri law governing causation in wrongful death cases, it was a matter of undisputed fact that Respondents did not cause D.G.'s death, (2) Respondents were immune from civil liability under section 632.440 of the Missouri comprehensive psychiatric services law (CPS law), sections 632.005–632.575, and (3) under the 2020 version of section 538.210, Clark failed to adduce competent evidence in support of her claim for aggravating circumstances damages.[1]

We reverse on all three bases. First, as to causation, by imposing on Clark the burden to show that the Respondents first inflicted an injury upon D.G. and then that that injury caused her suicide, the trial court misconstrued the Supreme Court's opinion in *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299 (Mo. banc 2011). Missouri law on causation in wrongful death cases is the same whether the death is by suicide or by any other means. *Id.* at 310. Applying the correct standard then, we reverse because the evidence Clark adduced through her medical expert witness that Respondents' alleged medical negligence caused or contributed to cause D.G.'s death by suicide made the causation element of Clark's wrongful death claim a disputed issue of fact precluding summary judgment.

---

[1] In early 2022, Respondents filed three separate summary judgment motions asserting similar claims. The trial court issued three separate judgments, one in favor of Dr. Holemon, another in favor of SSM Health St. Joseph Hospital, and a third in favor of both Dr. Freund and St. Charles Emergency Group. Because the bases for the judgments are substantially the same, we address them collectively.

Second, we reverse the trial court's blanket grant of immunity to Respondents because there is no basis in this record that the CPS law, sections 632.005–632.575, had been invoked, triggered, or had any application to this case whatsoever.

Finally, in granting summary judgment on Clark's aggravating circumstances damages claim, the trial court applied the wrong version of section 538.210 and therefore applied the wrong burden of proof to Clark's claim. Applying the correct version of the statute, Clark adduced sufficient competent evidence to render her claim for aggravating circumstances damages a genuinely disputed issue precluding summary judgment.

**Background**

On April 19, 2016, D.G. was suspended from school for ten days for fighting with another student. She was taken to the Warren County juvenile office and from there her mother, appellant Clark, took her home. That evening, D.G. became physically aggressive with her mother and with herself and threatened suicide. Her mother called the police. A Warrenton, Missouri police officer arrived to find D.G. sitting on the roof of the home. When the officer asked D.G. to reenter the home, she complied. D.G. told the officer that she was no longer suicidal but that she had formulated a plan on how she might do it. After discussing the matter with D.G. and with her parents, the officer arranged for an ambulance to take D.G. to SSM Health St. Joseph Hospital.

Upon arrival around 5 p.m., emergency department physician Dr. Laurel Baumstark evaluated D.G. and found her positive for depression and suicidal ideation. Dr. Baumstark described D.G. as labile[2] and depressed with suicidal ideation. D.G. told Dr. Baumstark she no

---

[2] Stedman's Medical Dictionary defines "labile affect" as "rapid shifts in outward emotional expressions . . . ." STEDMAN'S MEDICAL DICTIONARY 32 (Maureen Barlow Pugh et al. eds., 27th ed. 2000).

3

longer felt suicidal. Nurse Sheila Feldman performed a suicide screening shortly after D.G. arrived at the hospital and found that she was having suicidal thoughts and was at an immediate risk of suicide.

After this initial evaluation, Dr. Baumstark's shift ended and respondent Dr. Lee Freund's shift began. Nancy Wurtz, an intake clinician whose duties were to record and then convey the patient's history to a qualified mental health professional, performed a second suicide risk assessment. Wurtz then spoke by telephone for two to three minutes with respondent Dr. Holemon, the hospital's on-call psychiatrist. Based on the information provided by Wurtz, Dr. Holemon concluded that D.G. should be discharged. Dr. Freund agreed and discharged D.G. several hours after her arrival.

The next morning, D.G. became upset when she discovered negative social media posts by classmates referencing the fight for which D.G. had been suspended from school. A short time later, D.G. hung herself from a pull-up bar in her room and died two days later.

After Clark filed this action in February 2018, she retained Dr. Eric Caine, a board-certified psychiatrist, and Dr. Marian Betz, a board-certified emergency room physician. Dr. Caine testified that D.G.'s death was foreseeable and that the negligent actions and omissions of Dr. Holemon, Dr. Freund, SSM Healthcare St. Louis, and St. Charles Emergency Group caused or contributed to cause her death. Dr. Betz testified that Dr. Freund's actions fell below the standard of care because he did not provide a safe discharge plan.

On Clark's claim for aggravating circumstances damages, Dr. Caine testified that Respondents' treatment, assessment, and discharge of D.G., including their reliance on the assessment by Wurtz, who was unqualified to perform a psychiatric assessment, was reckless and demonstrated a complete indifference to or conscious disregard for D.G.'s health and safety.

4

Clark brings this appeal in eight points which we group as appropriate to address the three main issues before us – (1) whether in light of Clark's expert medical testimony, the causation element of her wrongful death claim is a genuinely disputed issue, (2) whether Missouri's CPS law, including its immunity provision, applies to this case, and (3) whether, under the correct version of section 538.210, Clark's claim that Respondents' conduct warrants the imposition of aggravating circumstances damages is a genuinely disputed issue of fact.

**Standard of Review**

Summary judgment is appropriate when the movant establishes there are no genuine issues of material fact and are entitled to judgment as a matter of law. *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 377 (Mo. banc 1993); Rule 74.04(c). A genuine issue of material fact exists when there is competent evidence of two plausible, but contradictory, accounts of essential facts. *Armoneit v. Ezell*, 59 S.W.3d 628, 631 (Mo. App. E.D. 2001). Thus, a defendant is entitled to summary judgment when he shows facts that negate any one of the necessary elements of the plaintiff's claim. *Blackwell Motors, Inc. v. Manheim Services Corporation*, 529 S.W.3d 367, 379 (Mo. App. E.D. 2017).

We review an appeal challenging the grant of a motion for summary judgment *de novo*. *Day Advertising, Inc. v. Hasty*, 606 S.W.3d 122, 129 (Mo. App. W.D. 2020). Thus, we do not defer to the trial court's order granting summary judgment "because the trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law." *Barry Harbor Homes Ass'n v. Ortega*, 105 S.W.3d 903, 906 (Mo. App. W.D. 2003). "Rather, we use the same criteria the trial court should have employed in initially deciding whether to grant summary judgment." *Id.* We view the record in the light most favorable to the nonmoving party and afford that party the benefit of all inferences which may be reasonably drawn from the

5

record.  *Barekman v. City of Republic*, 232 S.W.3d 675, 677 (Mo. App. S.D. 2007) (citing *ITT Commercial Finance Corp.*, 854 S.W.2d at 376).  Moreover, summary judgment is an extreme and drastic remedy, and appellate courts should remain cautious in affirming such judgments. *Boone County v. County Employees' Retirement Fund*, 26 S.W.3d 257, 260 (Mo. App. W.D. 2000).

## Discussion

**A.**     **Summary judgment not warranted on the causation element of Clark's claim.**

The evidence adduced by Clark that Respondents' negligence in connection with the psychiatric evaluation of D.G. and the decision to discharge her from the hospital on April 19, 2016, was sufficient to withstand Respondents' summary judgment motions because it demonstrated that the causation element of Clark's claim was a genuinely disputed issue.

To survive summary judgment on the issue of causation in a wrongful death case, a plaintiff must demonstrate that there are genuine issues of material fact regarding whether the defendant's conduct was both the cause in fact and the proximate, or legal, cause of the death. *Sundermeyer v. SSM Regional Health Servs.*, 271 S.W.3d 552, 554 (Mo. banc 2008); *Baker v. Guzon*, 950 S.W.2d 635, 646 (Mo. App. E.D. 1997).  The plaintiff must establish that, but for the defendant's actions or inactions, the patient would not have died.  *Sundermeyer*, 271 S.W.3d at 554 (citing *Mueller v. Bauer*, 54 S.W.3d 652, 656 (Mo. App. E.D. 2001)); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993) (explaining that "but for" causation is the "absolute minimum for causation because it is merely causation in fact" and that "[m]ere logic and common sense dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought.").

6

The Supreme Court has noted that "'[t]wo causes that combine' can constitute 'but for' causation." *Sundermeyer*, 271 S.W.3d at 554 (quoting *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. banc 2003)) (citing *Callahan*, 863 S.W.2d at 862). *Harvey* explains:

> The general rule is that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable, although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury.

95 S.W.3d at 96 (quoting *Carlson v. K–Mart Corp.*, 979 S.W.2d 145, 147 (Mo. banc 1998)).

In addition to "but for" causation, legal causation requires some sort of direct connection. *Baker*, 950 S.W.2d at 646 (noting that a negligence action will not lie, even where the "but for" test is satisfied, if the cause is remote and other, intervening events arise). In *Callahan*, however, the Supreme Court cautioned that a causation analysis should not lose sight of the ultimate issue:

> All of this discussion concerning the semantics of causation is less important in Missouri than in most jurisdictions because under MAI we do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor' when instructing the jury. We merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' plaintiff's injury.

863 S.W.2d at 863 (citing MAI 19.01 [1986 Revision] Verdict Directing Modification–Multiple Causes of Damage).[3]

Under the foregoing authorities, Dr. Caine's expert medical opinion testimony in this case readily satisfies Clark's burden on the causation element of her claim. Dr. Caine testified that the Respondents' care in connection with the psychiatric evaluation of D.G. and their decision to discharge her on the evening of April 19, 2016, fell below the standard of care which caused or contributed to cause D.G.'s death by suicide the next morning. Dr. Caine opined that D.G. should not have been discharged in light of her instability and volatility manifested by her

---

[3] In the 2012 revision, MAI 19.01 remains the same. MAI 19.01 (8th ed.)

April 19 attack on a fellow student, her April 19 attack on her mother, her suicidal threats and ideation including the April 19 positive findings in those regards by Dr. Baumstark several hours before Respondents discharged D.G.

We note that Dr. Caine did not eliminate all other possible contributing causes of D.G.'s suicide nor was he required to in order for Clark to successfully repel summary judgment on causation. *Sundermeyer*, 271 S.W.3d at 554-5 (quoting *Harvey*, 95 S.W.3d at 96) ("The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his [or her] negligence was not the sole negligence or the sole proximate cause, and although his [or her] negligence, without such other independent, intervening cause, would not have produced the injury.").

Based on the foregoing principles, the evidence Clark adduced that Respondents' negligent conduct caused or contributed to cause D.G.'s death by suicide was sufficient to make causation a genuinely disputed issue of material fact. Clark was not required to exclude other potential contributing causes to D.G.'s death.

1. ***Kivland* and the causation element of Clark's wrongful death claim**.

    *a. **Kivland v. Columbia Orthopaedic Group.***

    Furthermore, because the trial court's erroneous interpretation of the Supreme Court's holding in *Kivland* drove its summary judgment on the causation element of Clark's wrongful death claim, we are compelled to address that case in depth.

    The facts in *Kivland* are simple. In January 2005, Gerald Kivland was taken to surgery to correct his spinal curvature. 331 S.W.3d at 303. After Kivland emerged from the surgery paralyzed and in constant pain, he filed suit against the surgeon. *Id.* at 302. Fifteen months after

8

the surgery and eight months after filing suit, Kivland died by suicide. *Id.* His survivors continued the medical negligence suit and added a wrongful death claim alleging that the "intense and continuous pain" resulting from the negligent surgery caused or contributed to cause his death by suicide. *Id.* Kivland retained expert witness Dr. Michael Jarvis, a psychiatrist, who testified that the post-surgical pain caused Kivland's suicide. *Id.* at 304.

The trial court granted the defendant surgeon's motion to strike Dr. Jarvis' opinion testimony on causation. *Id.* Then, the court granted the defendant's summary judgment motion on the wrongful death claim because without Dr. Jarvis' expert testimony, Kivland could not demonstrate that the causation element was a genuinely disputed issue. *Id.* at 304, 306.

The Supreme Court reversed and in doing so "outline[d] the proper standard for determining when a negligent defendant may be held liable for a decedent's suicide in Missouri." *Id.* at 306. But before clarifying the proper standard, the Court revisited the existing caselaw from which *Kivland* was departing, primarily *Wallace v. Bounds*, 369 S.W.2d 138 (Mo. 1963), on the subject of causation when the alleged wrongful death is by suicide. *Id.* at 306-08. Pursuant to *dicta* in *Wallace*, recovery for suicide against a negligent party required the plaintiff to prove the suicide was "involuntary." *Id.* at 307. Under those precepts, an involuntary suicide results when a person becomes "insane and bereft of reason" as a result of a defendant's negligent conduct. *Id.*

The *Kivland* Court noted the struggles courts were having with the *Wallace* standard. The opinion in *Eidson v. Reprod. Health Servs.*, 863 S.W.2d 621, 627 (Mo. App. E.D. 1993), in particular, illustrated the standard's complexity and amorphousness. There, the Court noted that under the *Wallace* standard, a "voluntary suicide" is considered "a new and intervening act which breaks the causal connection between the allegedly negligent act and the death," while an

9

involuntary suicide is one done "under an insane impulse which is irresistible because the insanity has prevented his or her reason from controlling his or her actions." *Kivland*, 331 S.W.3d at 307-308.

The *Kivland* Court also noted other states' courts' struggles with the "irresistible impulse" test and concluded that the test was unclear and "[t]he better rule, therefore, is to focus on what Missouri cases actually require in wrongful death cases: whether the decedent's death was a 'direct result' of defendant's negligence." *Id.* at 309.

The Court concluded that because courts "interpreting *Wallace* have tried (and failed) to articulate a clear standard for determining when a negligent defendant can be held responsible for a decedent's suicide," it was time to abandon the focus on the decedent's mental state and instead focus on the causal connection between the conduct and the suicide. *Id.* at 308. In this regard, the Court noted Missouri's well-established causation standard applicable to a wrongful death case – whether the death was a direct result of a defendant's negligence – and rejected the defendant's request that the Court "make a general exception to the causation standard when the death is by suicide." *Id.* at 309.

So, after lodging "wrongful death by suicide" firmly in Missouri's longstanding wrongful death causation analysis, the Court turned to whether the Kivlands had satisfied the burden of proof on causation. "[A] plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Id.* (citing *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 239 (Mo. banc 2001)). The Court observed that a "plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the decedent's suicide was the 'natural and probable consequence' of the injury he suffered at the hands of the defendant." *Id.*

In reversing summary judgment, the Court concluded that Dr. Jarvis' expert medical testimony was admissible under section 490.065, the expert witness statute, and satisfied the Kivlands' burden to "offer evidence that Gerald Kivland's suicide was a direct result" of the defendant's negligence which made causation a question for the jury. *Id.* at 312-313.

### b. The trial court's erroneous construction of *Kivland.*

We now turn to the trial court's fundamental misreading of *Kivland* on which it based its rationale for summary judgment in this case. Despite *Kivland's* unequivocal dictate that in Missouri the causation element in a wrongful death by suicide case is subject to the same burden of proof as in any other wrongful death case, the trial court claimed that *Kivland* requires not just that the defendant's negligence cause or contribute to cause the suicide but that the defendant "'produce an injury' (e.g., extreme physical pain) to [D.G.] that later caused her to take her life." *Kivland*, 331 S.W.3d at 306; *Callahan*, 863 S.W.2d at 863. In this way, the trial court added a nonexistent element to Clark's causation burden – that the Respondents committed some injurious and negligent act upon D.G. which in turn caused her to take her own life.

As the following direct quotes from *Kivland* demonstrate, the Court could scarcely have made itself clearer: "Missouri's causation standard in a wrongful death case is that the decedent's death was 'a direct result' of a defendant's negligence." 331 S.W.3d at 309 (citing MAI 20.01, 20.02); "The better rule, therefore, is to focus on what Missouri cases actually require in wrongful death cases: whether the decedent's death was 'a direct result' of defendant's negligence." *Id.*; "Before a jury can decide causation, however, a plaintiff must offer evidence that the court determines would establish that the defendant's negligence was the proximate cause of the decedent's death." *Id.* (citations omitted); "… no modification is necessary to the MAI instructions; these instructions are perfectly adequate to submit the issue of causation. *See*

11

MAI 20.01 and 21.01 (requiring a finding that the decedent died as a direct result of the doctor's negligence in treating the patient for the jury to find for the plaintiff in a wrongful death case)." *Id.* at 310; "What is required is that the Kivlands offer evidence that Gerald Kivland's suicide was a direct result of Dr. Gaines' negligence." *Id.* at 312.

Admittedly, the Court in *Kivland* explained its holding in the context of the facts of that case wherein the defendant surgeon negligently injured Mr. Kivland during surgery, the painful sequela of which allegedly caused him to become suicidal. *Id.* at 310. We do not believe, nor do we consider it reasonable to conclude from the opinion, that the Court in *Kivland* was clarifying Missouri law to be that in all cases where the wrongful death is by suicide the plaintiff must first prove that the defendant injured the decedent before being allowed to submit on causation. In the quote below, the Court demonstrates its dual intent – (1) to clarify that the causation element in a wrongful death by suicide case is to be treated like any other wrongful death case, and (2) the particular facts in *Kivland* meant that the Kivlands would have to show that the injury caused by the defendant's alleged negligent surgery is what caused the suicide:

> "This Court is not making any changes to the causation standard for wrongful death. The Court simply is making it clear that when the decedent commits suicide, the plaintiff must show the suicide was caused by the negligently inflicted injury to make a submissible case. As a result, no modification is necessary to the MAI instructions; these instructions are perfectly adequate to submit the issue of causation. See MAI 20.01 and 21.01 (requiring a finding that the decedent died as a direct result of the doctor's negligence in treating the patient for the jury to find for the plaintiff in a wrongful death case).

*Id.*

Therefore, we reject the trial court's judgment in which it cherry-picked language from *Kivland* to reach its result. After applying the correct standard to the causation element in this case, we conclude that Clark adduced sufficient competent evidence on this summary judgment record to make the causation element a genuinely disputed issue of fact.

12

**2.** **Immunity from civil liability under section 632.440.**

The trial court's grant of immunity to Respondents under section 632.440 is erroneous because Respondents failed to demonstrate that Missouri's CPS law, sections 632.005–632.575, of which section 632.440 is a part, has any application whatsoever to this case.[4]

Chapter 632 created the "Division of Comprehensive Psychiatric Services" within the state department of mental health to provide and coordinate through public and private mental health facilities the provision of treatment for those in need of mental health service. Sections 632.105 through 632.175 contemplate and govern the provision of such services on a voluntary basis and sections 632.300 through 632.455, which the trial court relied on here, govern the involuntary civil detention or commitment of patients. Within those provisions, section 632.440 grants immunity from civil liability to health care professionals, public officials, and peace officers "performing functions necessary for the administration of this chapter" including "for investigating, detaining, transporting, conditionally releasing, or discharging a person . . . ."

The defense of immunity is an affirmative defense that Respondents have the burden to plead and prove. *Molasky v. Brown*, 720 S.W.2d 412, 414 (Mo. App. W.D. 1986); Rule 55.08; *see also Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 775 (Mo. banc 2015). Respondents' burden, therefore, is to demonstrate that the provisions of the CPS law were applicable to D.G.'s April 19, 2016 visit to the hospital in order for section 632.440's immunity to attach to Respondents' conduct that day. We find that Respondents have failed to do so and

---

[4] In the context of our holding here that Respondents are not entitled to immunity under section 632.440, respondent Dr. Holemon's failure to raise the immunity defense in her summary judgment papers provides an additional basis for reversal. *Public School Retirement System of Missouri v. Taveau*, 316 S.W.3d 338, 344-45 (Mo. App. W.D. 2010) ("[T]he trial court can grant summary judgment to a party only on the basis of the parties' summary judgment motions.").

13

the trial court's judgment to the contrary resulted from an erroneously facile interpretation of the language in section 632.440.

In reaching its decision that Respondents are immune as a matter of law pursuant to section 632.440, the court limited its analysis to whether Respondents satisfied section 632.005's definitions of "licensed physician," "mental health facility," and "mental health program" in order to reach its dispositive conclusion that "the defendants in this case fall under the statutory definitions and are subject to immunity from civil liability under the circumstances of this case." If only the analysis was so simple.

Section 632.440's immunity attaches when one of the professionals covered by the CPS law "perform[s] functions necessary for the administration of this chapter" including discharging a person who was admitted or detained pursuant to this chapter. The question is not whether the Respondents satisfied the CPS law's definition provisions. The question is whether D.G. was a person admitted or detained pursuant to the CPS law. And there is simply no evidence in this case that she was.

The CPS law outlines specific procedures and filings in order for a person to be considered voluntarily admitted or involuntarily detained under the CPS law. Section 632.110 of the CPS law mandates certain procedures with respect to the *voluntary* admission and discharge of a minor with a mental disorder to a mental health facility that would be within the law's purview. Section 632.110.1 requires the head of a private mental health facility to accept "any minor for whom *an application for voluntary admission* is made by his parent . . . ." (Emphasis added). Section 632.110.3 again references an "application" for admission of the minor and section 632.110.4 further states that a parent may request that a peace officer take a minor into custody and transport him to a mental health facility for evaluation "if the parent . . . applies for

14

such evaluation under subsection 1 of this section." There is no evidence in this record that any application was made pursuant to section 632.110 for D.G.'s voluntary admission to respondent SSM Health St. Joseph Hospital.

As far as the CPS law's *involuntary detention* provisions, sections 632.300–632.475, we likewise find no support in this record that these provisions were invoked. These civil detention or civil commitment procedures permit any adult or a mental health coordinator[5], who believes that a person with a mental disorder presents a likelihood of serious physical harm to herself or others, to file with the probate court an application to detain the person for evaluation and treatment. Section 632.300; Section 632.305. If the probate court finds probable cause that the person suffers from a mental disorder and presents a likelihood of serious harm to himself or others, then the court shall direct a peace officer to take that individual into custody and transport him to a mental health facility for evaluation and treatment not exceeding ninety-six hours. Section 632.305.3.

If the likelihood of serious harm to himself or others is considered *imminent*, the person may be detained and admitted to the facility *before* an application with the probate court is filed. Sections 632.305.3 and 632.203.4. Nevertheless, an application to the probate court must still be filed after the detention and the admission take place. Section 632.305.3 and section 632.305.4 broadly require in the context of an urgent detention and admission that an application be filed with the probate court by the instigating party, e.g., a mental health coordinator, a licensed

---

[5] A mental health coordinator is "a mental health professional who has knowledge of the laws relating to hospital admissions and civil commitment and who is authorized by the director of the department . . . to serve a designated geographic area or mental health facility and who has the powers, duties and responsibilities provided in this chapter." Section 632.005(11).

15

physician, a registered professional nurse, or a mental health professional "designated by the facility and approved by the department [of mental health]."

Nothing in this record demonstrates that <u>any</u> of the requirements necessary to invoke the CPS law's involuntary detention provisions were carried out. No application with the probate court was filed by anyone. The only forms Clark filled out were insurance and HIPAA consent forms.

It is manifest that on April 19, 2016, D.G., who was suicidal and acting aggressively with others, was taken by ambulance to the hospital where she was evaluated by Respondents and then discharged. Those facts alone do not invoke the CPS law. We find no authority for the trial court's basic premise that every mental health related visit to a hospital triggers the application of the CPS law. Since the CPS law was not applicable, its immunity provision, section 632.440, likewise has no application. Therefore, Respondents are not immune from civil liability in this case and summary judgment is reversed on this question.

**3.    Aggravating circumstances damages under section 538.210 (RSMo 2015)**

The trial court's application of the wrong version of section 538.210 (RSMo 2020) requires reversal of summary judgment against Clark on her aggravating circumstances damages claim because it substantially increased Clark's burden of proof on the issue. Under the correct version of section 538.210 (RSMo 2015), Clark readily satisfied her burden by adducing sufficient competent evidence through the testimony of her expert witness, Dr. Caine, that Respondents' conduct was reckless and demonstrated a conscious disregard for D.G.'s health and safety which satisfies the willful, wanton, or malicious standard set forth in the statute.[6] *Rhoden*

---

[6] The 2015 version of section 538.210 is applicable to this case because the death occurred in 2016. *Boland v. Saint Luke's Health System, Inc.*, 471 S.W.3d 703, 710 (Mo. banc 2015) ("A wrongful death cause of action accrues at death."). Because the 2020 amendment substantially

16

*v. Missouri Delta Medical Center*, 621 S.W.3d 469, 477 (Mo. banc 2021) (quoting *Bell v. Redjal*, 569 S.W.3d 70, 89 (Mo. App. E.D. 2019)).

To make a submissible case for aggravating circumstances damages against health care providers in a medical negligence action, a plaintiff must present clear and convincing evidence at trial that the health care provider demonstrated "willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition." *Dodson v. Ferrara*, 491 S.W.3d 542, 562-63 (Mo. banc 2016); *Lopez v. Three Rivers Elec. Co–op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000); Section 538.210.6 (RSMo 2015). Section 538.205(10) defines "punitive damages" as those intended to punish or deter willful, wanton or malicious misconduct, which includes exemplary damages and damages for aggravating circumstances. *Id.*

"Whether there is sufficient evidence for an award of aggravating circumstances damages is a question of law." *Brady v. Curators of Univ. of Missouri*, 213 S.W.3d 101, 109 (Mo. App. E.D. 2006). However, "'[i]n determining a summary judgment motion, the judge . . . is not to decide what the facts are or to make credibility determinations, but simply to determine whether there is a triable issue of fact.'" *Sauvain v. Acceptance Indem. Ins. Co.*, 339 S.W.3d 555, 569 (Mo. App. W.D. 2011) (quoting *Care & Treatment of Schottel v. State*, 159 S.W.3d 836, 844 (Mo. banc 2005)).

In *Nokes v. HMS Host USA, LLC*, 353 S.W.3d 6 (Mo. App. W.D. 2011), a civil action brought under the dram shop statute, the trial court granted summary judgment because it concluded that the plaintiff's evidence did not satisfy the clear and convincing evidence burden

---

changed section 538.210's punitive damages provision, the 2020 version of section 538.210 is not retroactive. *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 759-60 (Mo. banc 2010).

of proof set forth in the statute. *Id.* at 9. The plaintiff had adduced direct evidence, circumstantial evidence, and expert testimony to support the claim. *Id.* at 12. The court of appeals reversed because the clear and convincing evidence burden of proof was for the fact finder at trial and did "not modify this court's standard of review regarding summary judgment" which is whether the evidence adduced by the plaintiff established a triable issue of fact. *Id.* at 11. The court reasoned that "[t]he determination of clear and convincing evidence 'requires the [fact finder] to weigh the evidence and assess the credibility of the witnesses.'" *Id.* at 11 (quoting *Smith v. Square One Realty Co.*, 92 S.W.3d 315, 317 (Mo. App. E.D. 2002)). Thus, on a summary motion, the court does not decide whether the evidence presented is "clear and convincing;" rather, it only determines "whether the evidence is sufficient to demonstrate a genuine issue of material fact regarding all elements of the cause of action." *Id.* at 12.

Furthermore, in *Grewell v. State Farm Mut. Auto. Ins. Co.*, a breach of fiduciary duty case, the court reversed the summary judgment entered in favor of the defendant on the plaintiff's punitive damages claim. 162 S.W.3d 503, 505 (Mo. App. W.D. 2005). Like *Nokes,* the plaintiff's burden of proof at trial on a breach of fiduciary duty case is to prove with clear and convincing evidence that the defendant acted with evil motive and reckless indifference to the plaintiff's rights. *Id.* at 508. But since the case was before it on a summary judgment motion, the *Grewell* court ignored the clear and convincing standard, and instead looked to whether the Grewells had adduced sufficient facts regarding the defendant's evil motive and reckless conduct to render punitive damages a genuinely disputed issue of fact. *Id.*

So, at the *trial* of this case, Clark's burden will be to present clear and convincing evidence that the Respondents acted with a conscious disregard or deliberate indifference to D.G.'s health and safety. *Dodson*, 491 S.W.3d at 562-63. But her burden on this summary

18

judgment motion is to adduce enough competent evidence to make her claim for aggravating circumstances damages a genuinely disputed issue of fact. *Nokes*, 353 S.W.3d at 12. Our review of the judgments demonstrates that the trial court imposed on Clark the clear and convincing burden of proof and required Clark to persuade the trial court that she was entitled to an award of aggravating circumstances damages. In this regard, the trial court improperly forayed into the jury's realm and applied the wrong standard.

Moreover, we find that Clark presented sufficient evidence on aggravating circumstances damages to make that a genuinely disputed issue for which summary judgment is unjustified. Dr. Caine testified that Respondents' treatment, assessment, and discharge of D.G. demonstrated recklessness and showed a conscious disregard for her health and safety. In support of his opinion in this regard, Dr. Caine noted that Respondents allowed Wurtz, an unqualified intake clinician, to perform the suicide assessment that was used by the on-call psychiatrist Dr. Holemon and the attending emergency room physician Dr. Freund to make the decision to discharge D.G. As to Dr. Holemon specifically, Dr. Caine testified that her involvement in D.G.'s care lasted just two to three minutes, and that she failed to collect important and necessary information to formulate a "clear and evidence-based decision" on whether to discharge D.G. Further, he testified that Dr. Freund "just accepted at face value that [D.G.] was ready to leave." Thus, Clark offered ample evidence supporting her claim for aggravating circumstances damages which requires reversal of the summary judgment entered in favor of Respondents on the issue.

The impact of the trial court's error in relying on an inapplicable statute, section 538.210 (RSMo 2020), is manifest in light of the significant changes the legislature made to the statute. The current statute establishes that aggravating circumstances damages "shall be made only upon a finding by the jury that the evidence clearly and convincingly demonstrated that the health care

19

provider intentionally caused damage to the plaintiff or demonstrated malicious misconduct . . . ."  Moreover, the current statute added that an indifference to or conscious disregard for the safety of others does *not* constitute intentional or malicious conduct in the medical malpractice context.

We therefore reverse because the trial court erred in relying on the 2020 version of the aggravating circumstances statute and Clark alleged sufficient facts to preclude summary judgment as to her aggravating circumstances damages claim.  Section 538.210.6 (RSMo 2015).

## Conclusion

For the reasons set forth above, we reverse the summary judgments entered in this case.

_____
James M. Dowd, Judge

Kelly C. Broniec, P.J., and
Philip M. Hess, J., concur.